# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ ) |  |  |
| In re: ) |  |  |
| ) | Chapter 13 |  |
| FELIX ROSARIO and ) | Case No. 11-43200-HJB |  |
| ELIZABETH ROSARIO, ) |  |  |
| ) |  |  |
| Debtors ) |  |  |
| _____ ) |  |  |
| ) |  |  |
| UNITED STATES TRUSTEE, ) |  |  |
| ) | Adversary Proceeding |  |
| Plaintiff, ) | No. 12-4037 |  |
| ) |  |  |
| v. ) |  |  |
| ) |  |  |
| ) |  |  |
| ROBERT BURTON and ) |  |  |
| PINNACLE FINANCIAL ) |  |  |
| CONSULTING, LLC, ) |  |  |
| ) |  |  |
| Defendants ) |  |  |
| _____ ) |  |  |
| ) |  |  |
| In re: ) |  |  |
| ) | Chapter 7 |  |
| EUGENIA LOPEZ, ) | Case No. 11-45202-HJB |  |
| ) |  |  |
| Debtor ) |  |  |
| _____ ) |  |  |
| ) |  |  |
| In re: ) |  |  |
| ) | Chapter 7 |  |
| WILLIAM N. LACROIX and ) | Case No. 12-10024-HJB |  |
| NICOLE L. LACROIX, ) |  |  |
| ) |  |  |
| Debtors ) |  |  |
| _____ ) |  |  |

In re:                                        )
                                              )
                                              )      Chapter 13
        RAMON A. JAVIER,                      )      Case No. 12-40006-HJB
                                              )
                             Debtor           )
                                              )
In re:                                        )
                                              )
                                              )      Chapter 7
        VIDAL M. MOYA,                        )      Case No. 12-40277-HJB
                                              )
                             Debtor           )
                                              )
In re:                                        )
                                              )
                                              )      Chapter 7
        RUBEN MORILLO,                        )      Case No. 12-40334-HJB
                                              )
                             Debtor           )
                                              )
In re:                                        )
                                              )
                                              )      Chapter 13
        KIMBERLEY K. MORIN,                   )      Case No. 12-40335-HJB
                                              )
                             Debtor           )
                                              )

## MEMORANDUM OF DECISION

In these administratively consolidated proceedings, the United States trustee (the "Trustee") seeks fines, sanctions, and injunctive relief against non-attorney bankruptcy petition preparers, Robert Burton ("Burton") and the corporation through which he conducts business, Pinnacle Financial Consulting, LLC ("Pinnacle") (together, the "Defendants").  In various motions filed in the above-named debtors' cases and in the adversary complaint (the "Complaint," the "Adversary Proceeding") filed in the Rosario

case, the Trustee alleges that the Defendants have continually violated several provisions of 11 U.S.C. § 110[1] and have engaged in the unauthorized practice of law. In addition to monetary penalties, the Trustee also seeks an order permanently enjoining the Defendants from preparing bankruptcy petitions in the District of Massachusetts.  Pursuant to Bankruptcy Rule 7052, the following constitute the Court's findings of fact and conclusions of law.

I.    FACTS AND TRAVEL OF THE CASE

While many of the facts, some material and some not, have been the subject of dispute, a fair number are uncontested.  The following findings of fact are based on trial testimony (and the witnesses' varying degrees of credibility), the admitted evidence, and the Court's own records.  See Currie v. Wells Fargo Bank, N.A. (In re Currie), Slip Copy, Bankr. No. 11-17349-JNF, Adv. No. 12-1009, 2013 WL 1305805, *1 n.1 (Bankr. D. Mass. March 28, 2013) ("The Court may take judicial notice of the documents in the debtor's file and those in the Court's own records.").

A.    **Burton and the "Pinnacle System"**

Robert Burton is the sole owner of Pinnacle, a Massachusetts corporation located in Lawrence, Massachusetts.  Pinnacle provides a variety of "financial" and document preparation services for small businesses and individuals, many of whom are lower income and non-English speaking.  At the time of trial, Pinnacle had 9 full-time employees and 3 "independent contractors."  On its website, Pinnacle advertises

---

[1] All references to statutory sections are to the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code."). See 11 U.S.C. §§ 101 et seq.  All references to "Rules" or "Bankruptcy Rules" are to the Federal Rules of Bankruptcy Procedure.

various services, including "home loan modifications," "corporate restructuring," "venture capital," "tax strategies and preparation," "legal document preparation," "personal debt management," and "bankruptcy petition preparation and debt relief."

Burton is a graduate of the Massachusetts School of Law at Andover, and has worked as a paralegal, but he has not passed any bar exam and is not licensed to practice law in Massachusetts or any other jurisdiction. Burton advertises his education and paralegal experience on the Pinnacle website, on his business card, and in Pinnacle's offices.   On the Pinnacle website and on his business card, Burton is identified as "Robert Burton, J.D., CWM."[2]   The website further describes Burton as a law school graduate who previously worked for a law firm.   Burton's law school diploma is framed behind his desk in his office at Pinnacle.   There is no indication on the Pinnacle website or on his business card that Burton is not licensed to practice law. Burton admits that many clients come to the Pinnacle offices believing he is a lawyer and that, without being told otherwise, most clients would not know the difference between a law school graduate and someone admitted to practice law.

The Defendants say that Burton and Pinnacle first began preparing bankruptcy petitions in late 2007 or early 2008.   Burton testified that, prior to preparing petitions, he reviewed § 110 of the Bankruptcy Code,[3] researched issues related to bankruptcy petition preparation, and spoke with his law school bankruptcy professor.   According to

---

[2] Burton says that the "CWM" indicates his "Chartered Wealth Manager" designation.

[3] Section 110, which will be discussed more fully later in the opinion, "sets forth specific requirements and guidelines for bankruptcy petition preparers and specifies penalties for a preparer's noncompliance with these requirements."  Marshall v. Bourque (In re Hartman), 208 B.R. 768, 775 (Bankr. D. Mass. 1997).

Burton, by the spring of 2011, the Defendants had prepared approximately 150 bankruptcy petitions, filed almost exclusively in Massachusetts.[4]   In their initial responses to motions filed by the Trustee, the Defendants claimed that 97% of their bankruptcy clients have received a discharge.   In the Defendants' post-trial brief, they claimed to have assisted "over 100 debtors" filing Chapter 7 petitions, with an approximate Chapter 7 discharge rate of 98%.  Def. Post-trial Brief 3 § 4.  All of these claims are exaggerated.

According to the Court's records, the first case in which either Burton or Pinnacle is identified as the petition preparer was filed in March 2009.  From that time until the first day of trial (June 25, 2012), one or both Defendants were identified as the bankruptcy petition preparer in 106 cases, but only 81 were Chapter 7 cases; the remaining 25 were Chapter 13 cases.[5] None of the Chapter 13 debtors received a discharge; in fact, with the exception of the <u>Rosario</u> and <u>Morin</u> cases, every Chapter 13 case had been dismissed at the time of trial, primarily for failure to file the Chapter 13 plan or other documents.   The discharge rate for Chapter 7 cases filed by the Defendants is 90.8%.  When the Chapter 13 cases are included, the overall discharge rate for debtors who have filed with the Defendants' assistance is 71.8%.

The Defendants tout with pride the "Pinnacle System" for handling bankruptcy petition preparation.   They describe the "typical" case as follows.  When a potential client comes to Pinnacle's offices, the client is given two forms.  The first – the "Intake Form" – asks for the client's basic contact information and the type(s) of services being

---

[4] Burton testified that he prepared one bankruptcy petition filed in New Hampshire and one filed in Florida.

[5] Since June 25, 2012, the Defendants have filed 9 additional Chapter 7 cases.

sought.  Clients are also asked to read and sign a "Disclosure Form," which states, in both English and Spanish, that Pinnacle is not a law firm and that its employees are not attorneys and cannot give legal advice.  According to Tiesha Rosario ("Tiesha"), Burton's former executive assistant,[6] she explains the Disclosure Form to the client and also asks the client to read and sign it.  After completing the Intake Form and signing the Disclosure Form, the prospective client meets with Burton. Burton testified that he again reviews the Disclosure Form with the client.

When hired to prepare a bankruptcy petition, the Defendants request various financial documents from the client and obtain copies of the client's credit reports from the three leading credit reporting agencies.  Clients are also provided various written materials pertaining to bankruptcy laws, processes, forms, and procedures.  Included among those materials is a manual describing various aspects of bankruptcy law and procedure (the "Bankruptcy Manual").[7]  The Bankruptcy Manual contains information and explanations regarding many bankruptcy matters, including: an identification of non-dischargeable debts; a summary of Chapter 7 and other types of bankruptcy relief; an explanation of the changes made by the Bankruptcy Abuse and Consumer Protection Act of 2005[8]; a description of the Chapter 7 bankruptcy process and when the filing of a bankruptcy case would not be appropriate; the requirement to attend credit counseling and financial management courses; the bankruptcy case forms; the determination of

---

[6] Tiesha testified that she is still employed by Pinnacle, but now works on loan modifications.

[7] The Bankruptcy Manual was introduced into evidence with the first page missing.  The Court is unable to determine its provenance, since no testimony as to the author or title of the document was elicited.

[8] Pub. L. 109-8, 119 Stat. 23, enacted April 20, 2005, effective October 17, 2005.

which property can be claimed as exempt; the calculation of "eligibility" for Chapter 7 using the so-called "means test"; the meeting with the Chapter 7 trustee pursuant to § 341 of the Code (the "341 Meeting"); the client's property which may or may not have to be surrendered; and the receipt of a bankruptcy discharge. In addition, the Bankruptcy Manual provides step-by-step directions and information related to each document required to be filed. The manual concludes with a section defining bankruptcy terms. Several checklists related to Chapter 7 filings, schedules, statements, and fees are appended. <u>See</u> Ex. 5 1309-1367.

Bankruptcy clients are also provided with a chart detailing various exemptions that may be claimed on Schedule C (the "Exemption Chart"). <u>See</u> Ex. 5A. The chart, however, is incomplete (for example, it does not list an exemption for cash on hand). In addition, while it contains references to § 522(d) subsections (which debtors may employ to claim exemptions if they so elect pursuant to §522(b)(2)), the references to non-bankruptcy law (under which debtors may claim exemptions if they so elect pursuant to § 522(b)(3))[9] are references to *Minnesota* statutes. According to Patria Santos ("Santos"), a self-described "consultant" assisting with bankruptcy petition preparation at Pinnacle,[10] bankruptcy clients are also given other written materials (some of which are available in Spanish), but no such materials were introduced into evidence. For those materials not available in Spanish, Santos testified that Pinnacle

---

[9] "[P]ursuant to § 522(b)(1), a Massachusetts debtor may exempt interests in certain property from the bankruptcy estate by electing either the exemption scheme set forth in § 522(b)(2) (those listed in § 522(d)) or § 522(b)(3) (the "non-bankruptcy exemptions"). <u>In re Vierstra</u>, -- B.R. --, 12-31540-HJB, 2013 WL 1401494, *2 (Bankr. D. Mass. Apr. 8, 2013).

[10] Santos is also a fluent Spanish speaker and frequently acts as a translator for Spanish-speaking clients.

employees would translate for the client, if necessary.

In addition to being provided with written materials, bankruptcy clients are directed to certain websites, such as www.Nolo.com or www.Zillow.com, in order to research property values and obtain answers to bankruptcy questions, information related to bankruptcy terms, and advice on how to complete the forms.   Clients are given internet access in Pinnacle's offices, enabling them to research information on the specified websites as the documents are being completed.

The Defendants say that once the client is provided with these materials, the petition[11] is prepared in Burton's office with the client (as well as a translator, if necessary) and Burton each looking at separate computer screens containing identical images of the document being prepared.   Using a bankruptcy software program, Burton enters information into the program as prompted.   According to Burton, he and the client go through the petition line by line, with Burton entering information solely at the client's direction.

The aforesaid description of the process is not entirely accurate, however.   Some of the information is not entered verbatim from the client, but is actually compiled by Burton from the client's credit reports or other documents.   For instance, Burton testified that, in determining what number to enter for a client's income on Schedule I, he reviews the paystubs provided by the client, inputs that information into the schedule, and then asks the client to verify that the result is the correct amount.   And Burton admitted, in the context of the Morillo case, that he "quite possibly" used the debtor's

---

[11]   Unless otherwise indicated, the Court uses the term "petition" throughout this memorandum to refer not only to the voluntary petition itself (Official Form 1), but to all of the financial schedules, statements, and other documents commonly filed with the petition at the commencement of a bankruptcy case.

credit report to prepare Schedule F, the list of unsecured creditors.  Trial Tr. 5 65:10-12.

Burton says that he does not personally choose values for a client's real or personal property to be listed on Schedules A and B, and he further testified that he does not even direct clients as to how *they* should value their property.  But Yanelly Rodriguez ("Rodriguez"), another Pinnacle employee who assists with bankruptcy petition preparation,[12] testified that, with regard to personal property values, the client would be advised to use "how much they think it would be worth at a second-hand store, something like that."  Trial Tr. 4 73:22-24.  Burton also later testified that he would direct clients to the Zillow website to obtain values for their real property.  Trial Tr. 4 192:23.

To complete Schedule C-Property Claimed as Exempt, Santos testified that "[w]e ask the clients what property they want to keep, and they tell us."  Trial Tr. 4 73:20-21. Most of Pinnacle's clients elect the exemptions provided by § 522(d) of the Bankruptcy Code pursuant to § 522(b)(2).  According to Santos, the client is directed to the written materials they are given to assist with the election of the bankruptcy or non-bankruptcy exemptions.  If clients still have unanswered questions, they may be directed to visit the Nolo website for additional help with their decision.  Burton testified that most clients elect the federal exemptions based on an assumption that the "federal" exemptions are more appropriate, since the bankruptcy case is filed in a federal court.[13]  He also testified that bankruptcy clients "direct us as to what section of the Code they'd like to

---

[12] Rodriguez is also fluent in Spanish and assists in translating for Spanish-speaking clients.

[13] Then again, if the client is making the decision by reference to the Exemption Chart, the client is more likely to choose the bankruptcy exemptions given that the other presented option is a list of exemptions available under Minnesota law.

use based on the documents that we provide to them." Trial Tr. 5 72:25-73:2. According to Rodriguez, clients are also directed to consult the Nolo website (which contains exemption explanations and specific statutory citations) because Pinnacle deems that website to be "a reliable source." Trial Tr. 4 74:17-75:9.

But other testimony by both Burton and Pinnacle employees contradict the assertion that clients review the written materials and websites by themselves and then direct Pinnacle as to what should be entered on the petition. Rather, those materials are not just read by the client. They are further discussed with and explained to the client. Burton testified that "we go over it with them," Trial Tr. 5 72:25, and Santos testified that she and Burton would use the Exemption Chart to explain statutory citations and descriptions of exemptions. She further testified that the client's review of the materials would be followed by a "discussion." Trial Tr. 3 175:3-11. Rodriguez and Santos both admitted that Burton would discuss and summarize the materials, and would also answer clients' questions regarding the materials they were given. See Trial Tr. 4 35:23-36:1. ("Well, basically, we . . . give the materials to the client. And they read. They have questions. I translate the question. Rob gives me -- Robert Burton gives me the answer . . . ."); Trial Tr. 3 176:2-10. Burton also indicated that he would help a client "navigate the websites and the material." Trial Tr. 4 180:7-8. He insisted, however, that "when it came down to making an independent decision, I'm very careful, I try to be, making sure that we don't cross the line. [The client] . . . has to be the one to either point or tell me what exemptions [the client] wants to use." Trial Tr. 4 180:8-12.

The Trustee identified errors and inconsistencies in several of the petitions filed in the Debtors' cases. According to Burton, any errors in the bankruptcy documents

were the result of the client's errors; Burton claimed that he did not correct obvious errors because he believed doing so would amount to giving the client legal advice.

The Defendants say that, upon completion of the petition, every client is given a copy of the documents. The Defendants also arrange for the client to take the required prepetition credit counseling course by telephone in Pinnacle's conference room, and a copy of the certificate of credit counseling is then faxed to Pinnacle's office for filing with the petition.

Burton testified that he explains postpetition "administrative procedures" to bankruptcy clients. He describes what will happen after the filing and explains the clients' necessary attendance at the 341 Meeting and the requirement to complete a financial management course. The petition and filing fee are then either mailed from Pinnacle's offices or hand-delivered to the Court by a Pinnacle employee.

Shortly before a client's scheduled 341 Meeting, the Defendants arrange for the client to come into Pinnacle's offices again. At that meeting, the client is given a folder of documents, which includes copies of the petition, the client's driver's license and social security card, pay stubs, bank statements, tax returns, and the notice of the 341 Meeting. Santos testified that this is done so that the client does not misplace documents needed at the meeting. At least in some cases, Burton also uses this time to discuss with the client what to expect at the 341 Meeting, including the types of questions the Chapter 7 trustee may ask. And, in the Lacroix case, Burton specifically instructed the debtors to tell the Chapter 7 trustee that Burton was not an attorney and did not give them legal advice.

The Defendants charge a flat fee for bankruptcy petition preparation, but the fee

11

varies.  According to Burton, the fee is generally between $500 and $750, with Spanish-speaking clients charged the higher rate because of the need to use a translator.  The Court's records indicate, however, that the fees *recently* charged by the Defendants are much higher.  While in 2009, the Defendants' fees ranged from $150 to $650, with a majority of debtors disclosing a $250 fee paid to the Defendants for bankruptcy petition preparation, the fees charged in 2010 ranged from $100 to $1,000, with most debtors paying between $500 and $1,000 for petition preparation.  In 2011, the majority of Pinnacle's bankruptcy clients paid the Defendants $750, while seven debtors were charged $1,000 for petition preparation.  In 2012, a vast majority of debtors were charged $750 or more.

According to Burton, Pinnacle's fee is derived from standard operating costs, the costs of ordering credit reports from all three credit reporting agencies (which he claimed was between $70 and $90 for each client), printing and faxing documents, time spent following-up with clients, the need for translation services, and the use of Pinnacle's conference room.  The fee includes all work done for the client in relation to the bankruptcy case, including any post-petition work.  But no time or appointment records are kept for bankruptcy clients.

### B.    The Trustee's Motions and Adversary Proceeding

On December 13, 2011, the Trustee filed the first of the motions presently before the Court.  That motion, filed in the <u>Rosario</u> case, sought an order requiring Burton and Pinnacle to disgorge compensation and pay fines for their alleged violations of § 110.  The Trustee subsequently filed motions requesting disgorgement orders in the <u>Lopez</u>, <u>Javier</u>, <u>Moya</u>, <u>Morillo</u>, and <u>Morin</u> cases (the "Motion(s) to Disgorge").  After a hearing

held on April 4, 2012, the pending matters were consolidated for trial.  The Trustee was

granted leave to amend the Motions to Disgorge and to file an adversary proceeding to

be consolidated with any pending or subsequently-amended motions.  On April 18, the

Trustee filed amended motions in the <u>Javier</u>, <u>Moya</u>, <u>Morillo</u>, and <u>Morin</u> cases (the

"Amended Motion(s) to Disgorge") and also filed the Complaint commencing the

Adversary Proceeding in the <u>Rosario</u> case.  Also pending is an order to show cause in

the <u>Lacroix</u> case why fees should not be disgorged (the "Show Cause Order").[14]  All

matters were consolidated for trial.

A trial was conducted over 5 days, with 11 witnesses appearing.  Burton, Tiesha

Rosario, Santos, and Rodriguez testified at trial on the Defendants' behalf.  Several

debtors in these cases also appeared and testified: Vidal Moya, William Lacroix, Nicole

Lacroix, Kimberly Morin (and her non-debtor husband, Daniel Morin), Elizabeth Rosario,

and Felix Rosario.  At the conclusion of the trial, the parties were given an opportunity to

submit post-trial briefs with a further hearing for closing argument to be held after the

submission of those briefs.  After several extensions requested by the parties, post-trial

briefs were filed, following which the parties chose to waive closing arguments.

Generally speaking, with the isolated exceptions noted below, the debtors'

testimony was credible and forthright.  The testimony given by Pinnacle employees was

less credible – as the testimony neared those topics of most import (namely, evidence

regarding the potential unauthorized practice of law), that testimony appeared scripted

---

[14] Judge Joan Feeney issued the February 6, 2012 Show Cause Order, requiring (1) the
Defendants to show cause why all or part of the compensation paid to Pinnacle/Burton should
not be disgorged as excessive and (2) the Trustee to file a statement regarding his position
relative to the amount of compensation received.  The <u>Lacroix</u> case was subsequently
transferred to this Court.

and rife with contradictions. Burton's testimony in particular often lacked credibility, laced as it was with a certain degree of arrogance and condescension toward counsel for the Trustee. And when confronted with evidence suggesting the falsity or inaccuracy of statements made in the Defendants' prior pleadings, Burton seemed to fabricate excuses on the spot to explain them away. On the whole, the Court found that, while some of Burton's testimony may have been truthful, it was largely contrived, either before trial or on the spot, to avoid the potential ramifications of his business practices.

### C.    The Debtors

####        1.    In re William and Nicole Lacroix, Chapter 7 Case No. 12-10024

William and Nicole Lacroix were contemplating filing a bankruptcy case, and had begun making payments toward a $1,000 retainer to hire Attorney Lane Goldberg, when one of Nicole's friends told them that a Martin Corona would prepare their petition for $750. Although Corona, Burton's "best friend," Trial Tr. 5 47:23, was "waiting to be admitted to the Mass[achusetts] bar," id. at 39:13-14, he had not passed the bar at the time of trial and was not licensed to practice law in any jurisdiction. The Lacroixs went to Pinnacle's offices thinking they were hiring Corona to represent them in a bankruptcy case filing. But when they arrived, Corona instead introduced them to Burton, and the Lacroixs were told that Burton would prepare the bankruptcy petition. Nicole testified that, although they initially thought (based on discussions with Nicole's friend) that they were meeting with a lawyer, the Lacroixs were informed that Burton was not an attorney and could not give them legal advice.

When they met with Burton, the Lacroixs had already decided to file a bankruptcy case, and were "99% sure" that they wanted to file under Chapter 7. The Lacroixs

made the final decision, however, "after consultation" with Burton, who "suggested that [they] file Chapter 7." Trial Tr 1 42:14-25. Burton says that, although the Lacroixs did not require translation services, they were charged $750 for the petition preparation because they could only meet in the evenings.

According to William, the Lacroixs met with Burton at Pinnacle's offices three times – twice to bring documents and meet with Burton and once to take the credit counseling course. William estimated that the Lacroixs spent a total of 2 hours and 15 minutes at Pinnacle's offices meeting with Burton.

William testified that Burton obtained the Lacroixs' credit reports, asked them a series of questions regarding their financial matters, and prepared most of the petition based on that information. William says that Burton discussed with them the values for their personal property to be listed on Schedule B and that Burton supplied the numbers used for their secured debts on Schedule D. William further testified that Burton independently completed the statement of financial affairs and Schedule C (the Lacroixs' list of claimed exemptions) before reviewing those documents with them.

In their post-trial brief, the Defendants claim that the *Lacroixs* chose the exemptions to be claimed on Schedule C. But it was William's testimony that, although he had some familiarity with the concept of exemptions from a previous bankruptcy case filing and explained what they were to Nicole, it was Burton who actually chose the exemptions. In support of the contention that William chose the exemptions to list on Schedule C, the Defendants refer in their post-trial brief to William's testimony regarding valuing property for purposes of *Schedule B*. But William's testimony regarding the completion of Schedule C was:

15

Q.    The Schedule C . . . , who filled that document out?

A.    That was one of the pages that was filled out for us.

Q.    Did you have any questions about it?

A.    At the time we didn't besides not knowing what all the codes were, but I figured that's what . . . our bankruptcy preparer should know, not us.

Q.    Did he explain to you what they were?

A.    No.

Trial Tr. 1 60:21-61: 5.

The Defendants maintain that Pinnacle staff spent 35-40 hours on the Lacroixs' case, although there are no contemporaneous time records or appointment logs to support that assertion. The Defendants also claim that the Lacroixs met with Burton at Pinnacle's offices on December 8, 13, 16, 20, and 28, 2011, and January 3, 2012 to complete the petition. However, although the petition was filed on January 3, the signatures are all dated December 27, 2012. Burton attempted to explain this discrepancy (and similar discrepancies in other cases) by claiming that documents were sometimes printed on one date, but not signed until a later date. But the Lacroixs could not have been in Pinnacle's offices to work on and complete the petition on December 28 or January 3, as the completed documents were at least printed, if not actually signed, on December 27.

William's testimony regarding the manner in which the petition was prepared was far more credible than the assertions made by the Defendants in pleadings and by Burton at trial. While William's displeasure with Burton and Pinnacle's services was palpable at times, he testified credibly regarding the number and nature of meetings

with Burton at Pinnacle's offices.  The Defendants' claim as to the number of meetings with the Lacroixs, on the other hand, was marked by inconsistencies and unsupported assertions regarding the amount of time spent working on the case.  The Court finds that Burton completed most of the petition not at the Lacroixs' direction, but by using the information gleaned from the Lacroixs' credit reports and solicited from the Lacroixs in response to his general questions regarding their financial affairs.

When the Lacroixs returned to sign the petition, William says, they did not go over the documents line by line. But the Lacroixs did notice, and were concerned about, the amount of excess monthly income listed on Schedule J ($569.97).  According to William, when they expressed concern about that amount, which was not correct, the Lacroixs were told not to worry about it.

William maintains that the Lacroixs did not receive a copy of the documents when they were signed.  In fact, William testified that he asked for a copy and was told that it was not possible, as the documents were needed for filing the next day.  William also says that he gave Pinnacle a money order for the filing fee to be sent with the petition.  In response to the Show Cause Order, the Defendants initially maintained that the Lacroixs were given 2 copies of the petition – one for their records and one to file with the Court.  The Defendants also claimed that the Lacroixs themselves filed the petition with the Court.  In the post-trial brief, however, the Defendants state that the Lacroixs mailed the petition and the filing fee "from Pinnacle's office" on January 2.  Def. Post-trial Brief 19 ¶ 65.  The Court does not believe that the *Lacroixs* mailed the documents themselves; rather, the Court finds that, consistent with Pinnacle's usual practice, Pinnacle employees mailed the petition and filing fee to the Court on the

Lacroixs' behalf.

The Lacroixs' petition and filing fee were received on January 3, 2012.[15]  The voluntary petition, schedules, statement of financial affairs, certification of § 342 notice,[16] and Official Form 19,[17] are each accompanied by a disclosure and signature of non-bankruptcy petition preparer (the "petition preparer certification") executed by Burton on behalf of "Robert Burton Pinnacle Financial Consulting LLC."  Burton's full social security number is listed on all of the petition preparer certifications.  But the statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, Official Form 22A (the "means test form"), statement of social security number, and statement of intention are not accompanied by petition preparer certifications.  Furthermore, the petition did not contain the Lacroixs' telephone number as required of *pro se* debtors.  Accordingly, on January 3, 2012, the Court issued an Order to update the petition ("Order to Update"), requiring that telephone number to be provided.

Shortly before the 341 Meeting, the Lacroixs returned to Pinnacle's offices.  At that meeting, William testified, Burton explained the process and what to expect at the 341 Meeting, including what kinds of questions would be asked, what kinds of answers

---

[15] The Lacroixs' case was originally filed in Boston and assigned to Judge Feeney, but was transferred to this Court on March 12, 2012.

[16] Section 521(a)(1)(B)(iii)(I) requires a bankruptcy petition preparer to provide an individual consumer debtor with primarily consumer debts a copy of the notice required by § 342(b) of the Code, which notice is set forth in Official Form 201A.  The bankruptcy petition preparer and the debtor certify the debtor's receipt of that notice on Official Form 201B.

[17] Official Form 19 "contains the notice a bankruptcy petition preparer is required to give to a debtor under § 110 of the Code . . . and the bankruptcy petition preparer's signed declaration (also required by § 110 of the Code) that the notice was given to the debtor."  2005-2007 Committee Note.

to give, and what documents should be taken.  According to William, Burton specifically told them to tell the Chapter 7 trustee that he (Burton) did not give them legal advice. The Lacroixs again reviewed the petition with Burton, and according to William, the Lacroixs were given advice during that review as needed.  For example, when the Lacroixs again questioned the amount of excess income on Schedule J, William says that Burton told them that the Chapter 7 trustee would not care.  The Lacroixs were then given a copy of the petition, which William says was the first copy they had received.

At the Lacroixs' 341 Meeting, the Chapter 7 trustee *did* raise an issue regarding the amount of their reported monthly excess income and suggested that the Lacroixs re-examine their Schedule J.  Also at the 341 Meeting, William completed a bankruptcy petition preparer survey in which he indicated that Burton had not provided the Lacroixs with legal advice.  See Ex. 2 499-501.  However, in answer to whether Burton explained certain matters to them, he checked "yes" with regard to: the difference between secured and unsecured debts, the meaning of "unliquidated debt," which chapter would be right for them, what Chapter 13 was, what kinds of questions may be asked at the meeting of creditors, what rights they had to claim property exempt, whether they could sell or transfer property, how to value property/assets, the use of a "yard sale" or "garage sale" method in valuing property, whether they would be able to keep certain property, whether they were required to disclose an asset, how to complete questions on the statement of financial affairs, whether any debts might be nondischargeable, what effect bankruptcy would have on student loans or child support, what it means to reaffirm a debt, whether or not to pay a certain debt, and the difference between federal and Massachusetts exemptions.

William also indicated on the survey that, although Burton helped the Lacroixs decide which exemptions to claim, Burton did not provide them with written materials with which to make the decision.  William indicated that the Lacroixs were given only oral, not written, instructions on preparing the petition.  He further indicated that the Lacroixs spent about 4 hours with their petition preparer over 3 meetings,[18] that the preparer filed the documents, and that the preparer collected the filing fee for the case.

After the 341 Meeting, the Lacroixs called Pinnacle and reported the Chapter 7 trustee's concerns over their excess income.  Burton told them they would need to file a motion to amend their schedules, and that he would prepare the motion for them.  The Lacroixs later went to Pinnacle's office to sign the motion prepared by Burton.  The motion was filed on February 6, 2012, but there is no indication on that motion that it was prepared by Burton.

By February 9, 2012, the Lacroixs had not complied with the Court's Order to Update by providing their telephone number, and the case was dismissed.  According to Burton, he *had* sent in a response to the Order to Update that included the Lacroixs' telephone number, but the certified mailing was not claimed at the Boston clerk's office.  Burton then prepared a motion to vacate for the Lacroixs, which was signed by the Lacroixs and filed with the Court on February 14, 2012.  There is no indication on the motion to vacate that Burton had prepared the motion on the Lacroixs' behalf.

By this time, the Lacroixs were displeased with Pinnacle's services, and reconsidered their earlier decision not to hire Attorney Goldberg.  He entered an appearance for the Lacroixs on March 18, 2012.  The Lacroixs' case was ultimately

---

[18] In his earlier testimony, William had explained that one meeting was for the purpose of taking the credit counseling course, which lasted approximately one and a half hours.

reinstated and they received their Chapter 7 discharge on April 10, 2012. The case remains open pending a resolution of the matters currently before the Court.

2.    In re Vidal M. Moya, Chapter 7 Case No. 12-40277

Vidal Moya hired the Defendants to prepare a Chapter 7 bankruptcy petition, filed on January 27, 2012. According to Moya, he decided to file under Chapter 7 based on discussions with a friend, and had already made that decision before hiring the Defendants to prepare the petition. He testified that he met with Burton over the course of several meetings to complete the documents.

According to Santos, during the first meeting, Moya was told which documents he needed to provide to Pinnacle and he then returned with those documents for the second meeting. During the third meeting, Santos says, Moya came to Pinnacle's offices to take the credit counseling course. She, Moya, and Burton then met a fourth and fifth time to actually complete the petition, with each of those meetings lasting a couple of hours.

Santos testified that she, Moya, and Burton met in Burton's office to prepare the petition line by line, with Burton asking questions of Moya and Santos translating. Santos says that Moya was given various handouts and pamphlets, including the Bankruptcy Manual and Exemption Chart, and that some of the materials were in Spanish and others in English that were translated for him. Santos testified that Moya provided the values for his real and personal property, and was directed to the Zillow website to assist with valuing his real property.

To complete Schedule C, Santos testified that Moya was directed to the Nolo website for assistance in choosing his exemptions. Regarding Moya's election to claim

the bankruptcy exemptions pursuant to § 522(b)(2), as opposed to the non-bankruptcy

exemptions pursuant to § 522(b)(3), Santos testified:

| | |
|---|---|
| THE COURT: | So do you remember Mr. Burton saying to Mr. Moya which do you want to choose, 11 U.S.C. 522(b)(2) or 11 U.S.C. 522(b)(3)? |
| THE WITNESS: | If I remember him communicating that? I believe so, yes. |
| THE COURT: | You believe he said that? |
| THE WITNESS: | Maybe not in those terms. |
| THE COURT: | In what terms then? |
| THE WITNESS: | I don't recall. |

Trial Tr. 3 167:3-11.

According to Santos, Moya did not specifically relate which statutory citations to

list in support of his claimed exemptions; instead, he chose them from the materials he

was given.   In fact, Santos testified, she and Burton "explain[ed] to Mr. Moya the

different exemption statutory numbers and descriptions" and discussed the Exemption

Chart with Moya before Moya chose his exemptions.  Trial Tr. 3 175:3-13.  When the

Court questioned Santos on how Moya had determined to exempt his $500 cash on

hand under § 522(d)(5), Santos testified that he chose it from the Exemption Chart.  But

when it was noted that there was no exemption listed for currency on that document,

she said that perhaps Moya had found the statutory reference in another document.

And despite Santos's testimony that Burton explained and discussed the

materials provided to Moya prior to his actually choosing the exemptions to list on his

Schedule C, Moya appeared in his testimony to have little or no understanding of what

the exemptions were or how they were chosen.  Based on Moya's testimony, the Court

concludes that it was Burton, and not Moya, who made the election under § 522(b)(2) to claim the exemptions provided under § 522(d) and chose the statutory citations listed on Moya's Schedule C.  The only decision Moya seems to have made without Burton's aid was the decision to file under Chapter 7.

With respect to the completion of the means test form, Santos testified that it was "explained to [Moya] that he would have to qualify for the actual -- to file a Chapter 7." Trial Tr. 3 169:12-14.  When asked if, after completing the form, she told Moya "that he qualified," Santos answered "correct."   Trial Tr. 3 169:18-19.   And while Santos first testified that Burton did not explain the means test to Moya and did not discuss the form with him other than to ask questions and input answers into the software, she later admitted that Burton *did* review with Moya the explanations in the Bankruptcy Manual with regard to completion of the means test form.   Not just with Moya, according to Santos, but with all debtors, Burton would discuss the material in the Bankruptcy Manual and "would summarize it."  Trial Tr. 3 176:2-9.

In the response to the Motion to Disgorge, the Defendants claimed that Pinnacle employees spent 35-40 hours working on Moya's case, and that Moya came to Pinnacle's offices on January 1, 5, 9, 12, 18, 25, and 27 to complete the petition.  That representation, however, is contradicted by Santos's testimony and other admitted evidence.  Santos testified that Moya spent only two meetings with Burton to complete the petition.  And Moya's Intake Form is dated January 18, 2012, a date *after* 4 of the days the Defendants say Moya was in Pinnacle's offices to work on the petition. Furthermore, the petition, schedules, and statements are all dated January 25, so Moya could not have been in Pinnacle's offices to *complete* the documents after that date.

The credit counseling certificate, too, is dated January 25, the same date the documents were complete and printed, while Santos testified that Moya took the course *prior* to the two meetings where she, Moya, and Burton completed the petition together.

Given this evidence, it appears far more likely that Moya came to Pinnacle's offices, indicated that he wanted to file for Chapter 7, and was told which documents the Defendants would need to complete the petition.  It appears that Moya returned to the offices on January 25 to take the credit counseling course and sign the petition documents that were substantially, if not entirely, completed for him by the Defendants based on the documents Moya had provided.

Moya testified that he went through the documents with a Pinnacle employee when signing, but did not testify that Burton was present.  Santos, however, says that she and Burton were both present when Moya signed the documents, with Burton reviewing the petition and Santos translating. Santos testified that Moya was given a copy of the petition at that time, while the Defendants' response to the Motion to Disgorge states that Moya was given 2 copies – one for filing with the Court and the other for his records.  Moya did not testify to receiving a copy of the petition at the time he signed, but stated that he received a copy of the documents later, during the meeting at Pinnacle's offices shortly before his 341 Meeting.  The Defendants admit that Moya provided a money order for the filing fee "in order for Pinnacle to mail his petition to the court."  Def. Post-trial Brief. 24 ¶ 94.

According to Moya, he paid $1,500 to the Defendants for the petition preparation. No fee agreement was produced.  However, an invoice dated January 18, 2012 reflects a payment to the Defendants from Moya in the amount of $1,500 for "chapter 7

Bankruptcy Petition preparation." Ex. 1 767, 768.  Moya believed the $1,500 charge reflected the fact that he was Spanish-speaking and needed translation services.  But both the disclosure of compensation and statement of financial affairs state that Moya paid only $750 for the petition preparation.  The date of payment on the statement of financial affairs – January 25 – also contradicts the January 18 date of payment reflected on the invoice.

To explain the discrepancies between the fees listed on the invoice and those disclosed with the petition, Burton and Santos both testified that the fee for petition preparation *was* only $750, and that the additional $750 related to charges for separate loan modification services.  According to Santos, the additional moneys represented the remaining balance owed for loan modification services provided to Moya's brother. Burton testified, however, that the extra $750 charge stemmed from *additional* services that would need to be performed on a loan modification for a mortgage that Moya and his brother had jointly executed regarding property owned by Moya's brother.  Burton testified that Moya had originally come to Pinnacle's offices with his brother looking for assistance with a loan modification on the property, and that they had previously paid $2,500 or $3,000 for those loan modification services.  When Moya decided that he no longer wanted to be responsible for the mortgage obligation and wanted to file a bankruptcy case, Burton says he charged Moya a $750 fee for resubmission of the loan modification package.

But Moya had no recollection of being charged an additional $750 related to loan modification services:

> Q.     Let me ask you if you remember this. When you were talking about how much you were going to pay to Mr. Burton's company, do you

> remember if he said he would charge you 750 dollars to help you with the bankruptcy, and he would charge you, because your brother was not available, 750 dollars to continue working on the loan modification since your name was still on the loan, do you remember that discussion?

A.   I don't remember that.

Q.   You don't remember speaking with Mr. Burton, and that lady, her name is Patria Santos, one day when you were talking about how much money you owed to Mr. Burton's company?

A.   No. I don't, no.

Trial Tr. 1 26:22-27:8.

The Court found Moya's testimony in this respect sincere and credible, as well as consistent with the invoice generated contemporaneously with his $1,500 payment on January 18. In contrast, Santos and Burton proffered differing rationales for the assertion that $750 of the amount Moya paid was for services unrelated to the petition preparation. And the statement of financial affairs provides little support for their stories in light of the fact that the date of payment was not correct. Accordingly, the Court concludes that Moya was in fact charged $1,500 for the Defendants' petition preparation services.

The voluntary petition, schedules, statement of financial affairs, certification of § 342 notice, and Official Form 19 are each accompanied by a petition preparer certification signed by Burton on behalf of "Robert Burton—Pinnacle Financial Consulting LLC." Burton's full social security number is listed on each petition preparer certification, with the exception of the certification on Official Form 19, which contains only the last four digits. The statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, means test form, statement

of social security number, and statement of intention are not accompanied by petition preparer certifications. And the certification of completion of the financial management course, signed by Moya and dated April 18, 2012, appears to have been generated and completed using the same software used to complete the other documents in his case (i.e., by the Defendants), but is not accompanied by a petition preparer certification.

As originally filed, the petition listed Moya's spouse as a codebtor, although she was not involved in the bankruptcy case filing and signed none of the documents. To correct this error, Burton drafted a motion to amend the petition to remove Moya's spouse, which motion was filed on February 6, 2012. The motion itself is signed by Moya and contains no indication that Burton actually prepared the motion, although he did complete the petition preparer certification on the amended petition itself.

Moya returned to Pinnacle's offices the day before the 341 Meeting. At that time, he received documents and records he would need to bring with him to the meeting, and also received a copy of the petition. The Court finds that, contrary to Santos's testimony, this was the first time Moya received a copy of those documents.

Postpetition, Moya also visited Pinnacle's offices when he received communications from the Chapter 7 trustee, the United States trustee, the Court, or the clerk's office in order to have them translated. He also returned to Pinnacle's offices to take the financial management course.

The Defendants also drafted an affidavit on Moya's behalf, although its purpose is not entirely clear. It appears to have been provided to Moya to bring with him to the 341 Meeting. The affidavit contains several statements, including that: Moya voluntarily sought out the bankruptcy petition services, did not receive legal advice, and knew

Burton was not an attorney.  And, in contrast to Moya's testimony at trial that he did not research the cost of hiring an attorney, the affidavit states that Moya chose the Defendants to prepare the petition after being given "prohibitive cost estimates of $2,500-$3,000 . . .  by Greater Lawrence area attorneys."  Ex. 1 759 ¶ 3.  The affidavit further states that Moya would recommend Pinnacle to others and that Pinnacle staff took 30-40 hours to complete his petition, spoke to him in Spanish, let him use Pinnacle's resources, and put him at ease.  The Court finds that the Defendants prepared the affidavit without Moya's input, although Santos testified that it was prepared at Moya's direction.  Moya did not clearly recall signing the document (and also noted that the document contained an incorrect middle initial).

Moya received a Chapter 7 discharge on April 25, 2012.  The case remains open pending a resolution of the matters currently before the Court.

### 3.    In re Kimberley K. Morin, Chapter 13 Case No. 12-40335

Kimberley Morin originally hired the Defendants to help negotiate modifications of the mortgage loans for her primary residence and an investment property.  She paid the Defendants $2,500 for those loan modification services.  Kimberley became acquainted with Pinnacle through her husband, Daniel Morin, who had previously hired the Defendants to work on a loan modification for a separate investment property.  According to Daniel, he and Burton did not discuss whether or not Burton was a licensed attorney, because Daniel's primary concern was whether Pinnacle could provide the services he needed (which Daniel concluded they could).  Daniel testified that he believed Burton to be an attorney because Burton said he had gone to law school and Daniel noted that Burton had a law degree framed on his office wall.

Kimberley testified that she also thought that Burton was an attorney because her husband had told her he was. And while in Burton's office, she had also noticed the framed law degree on the wall. According to Kimberley, there were no specific discussions about whether or not Burton was an attorney; she had assumed that "he was an attorney that owned a financial firm that did modifications." Trial Tr. 2 30:9-10.

Burton says that both Kimberley and Daniel were told that Burton was not an attorney. Burton specifically remembered informing Daniel, in Kimberley's presence (at a meeting regarding Daniel's later bankruptcy case filing), that Burton did not practice law and could not give legal advice. Burton further testified that Kimberley was told again that he was not an attorney when he began to work on her loan modification. Kimberley conceded that at the time she signed the paperwork to begin the modification process in August 2011, she signed a document stating that the Pinnacle employees were not attorneys and were not permitted to engage in the practice of law.

According to Kimberley, Burton suggested that she file a bankruptcy case prior to her retention of the Defendants to work on her loan modifications. She says that they had discussed the possibility of her filing a Chapter 7 case if the loan modification process was successful, because Burton "had some way of wiping out [the] second mortgages. So Chapter 7 was truly the bankruptcy we started off talking about, if the loans got modified." Trial Tr. 2 70:21-24. According to Kimberley, however, she did not want to file a bankruptcy case, because she feared that she would lose her license as a mortgage originator. Kimberley testified that it was Burton's suggestion that she ultimately file a Chapter 7 case that "started the whole I don't want to file bankruptcy" discussion. Trial Tr. 2 70:24-25.

29

In a later series of emails between Kimberley and Burton, Burton again suggests the possibility of Kimberley filing a bankruptcy case – this time, under Chapter 13.  In response to Kimberley's suggestion that she wanted to begin working on a modification of the mortgage loan on her primary residence, Burton wrote: "your case is complex and my initial analysis, I would even consider a chapter 13 Bankruptcy, sooner rather than later.  It all depends on your income.  With the economic sentiment being so negative, it may be an option; long term."  Ex. 3 1244.  At trial, Burton was equivocal on who broached the topic of filing for bankruptcy, testifying that "bankruptcy was -- came up in some form or fashion.  I'm not sure if she had prior experience.  I believe she did. But she had -- definitely said I don't want to do a bankruptcy because I'm going to lose my license."  Trial Tr. 4 131:16-19.  Based on the testimony and admitted evidence, the Court concludes that Burton, and not Kimberley, first suggested that she file a bankruptcy case, even before the Defendants were hired to work on her loan modifications.

In August 2011, Kimberley provided the documents and paperwork necessary to begin the loan modification process; and she provided documents again in November and January.  In October 2011, Kimberley received notice that the lender was proceeding with the foreclosure process on both properties, but had not established a sale date.  However, in early January 2012, she received a telephone call from a Pinnacle employee informing her that a sale date for both properties had been set for February 1, 2012.

Although she believed that Pinnacle employees were still working on the loan modifications, Kimberley scheduled an appointment with Burton in mid-January,

because, as the auction date approached, she began to worry:

> because I knew about the foreclosure actions on my house on the 1st and
> I wanted to find out what was going on, what we could do. I needed this
> stopped. I was -- I was kind of panicking over this. And, you know, he
> calmed me down and said that this is the way it works, and we have to
> wait till five days before the foreclosure.

Trial Tr. 2 28:22-29:4. At the mid-January meeting, according to Kimberley, Burton told

her that, because of the backlog of cases in the modification process, the lender would

not officially cancel the foreclosure sale until within 5 days of the scheduled sale date.

She told Burton that she was still extremely reticent to file a bankruptcy case unless it

became a "last-ditch option" in order to save her primary residence. Trial Tr. 2 69:17.

Kimberley says that Burton told her that she should not "jump the gun," since the

lender's decision to cancel the auction would not be final until days before the actual

sale date. Trial Tr. 2 69:9.

In the following days, Kimberley believed that Pinnacle continued to work on the

loan modifications and that the modifications were still under review. Then, in late

January, she received a message from a Pinnacle employee requesting her availability

for a conference call with Burton. Kimberley, however, wanted to meet with Burton in

person, as time was growing short and, to her knowledge, the foreclosure sale had not

yet been canceled. She was not told at that time that her modification requests were

denied by the lender on January 23. Instead, she received an appointment for an in-

person meeting at Pinnacle's offices on January 30, 2012, just 2 days before the

scheduled foreclosure sales.

When Kimberley and Daniel arrived at Pinnacle's offices on January 30, they

were escorted to Burton's office. Attorney Fabian Guerrero, but not Burton, was there,

and began to speak with Kimberley about filing a bankruptcy case.[19]  Upset because she thought the meeting was scheduled to discuss the modification process and whether the lender had canceled the auction scheduled for February 1, Kimberly asked to speak with Burton.

When Burton came into the office, he informed Kimberley that the only way to stop the foreclosure would be to file a Chapter 13 bankruptcy case.  According to Kimberley, Guerrero offered to represent her for a fee of $3,000, or Pinnacle would do a "skeleton filing" for $500.  Trial Tr. 2 78:24.[20]  Daniel also testified that Burton suggested Pinnacle prepare and file a "skeleton bankruptcy," that the case would not last long, and that the filing would be made just to buy time.  Trial Tr. 2 117: 4-6.  Neither Kimberley nor Daniel understood the difference between what Pinnacle would file and what Guerrero would file if hired to represent her.[21]

Given that the foreclosure sale was looming, Kimberley decided to file a case under Chapter 13, believing it was her only option at that point to stop the foreclosure

---

[19] Attorney Guerrero had represented Daniel Morin in his previously-filed (and subsequently-dismissed) bankruptcy case.  According to the Defendants, Attorney Guerrero had an office within Pinnacle's office suite from early 2011 through October of that year.  Burton insists that Attorney Guerrero was not working with Pinnacle, was only renting office space, and had a sign on his door indicating that it was Attorney Guerrero's law office.  Although Burton says that he sometimes referred debtors to Attorney Guerrero, he also testified that neither he nor Pinnacle ever received compensation for those referrals.

[20] Kimberley initially testified that she was quoted a fee of $750, but later clarified that the quoted fee from Pinnacle was $500 – which the parties agree is how much she paid for the petition preparation.

[21] Burton did not dispute at trial that Kimberley was urged to file a bankruptcy case in order to stop the foreclosure.  However, he *did* dispute the assertion that he suggested the filing of a skeleton petition.  He testified that it is Pinnacle's practice to try to always file as complete a petition as possible, because he believed the filing of minimal documents to commence a bankruptcy case was an "abuse of process."  Trial Tr. 4 170:24-171:1.

and save her home.  She decided to hire Pinnacle to prepare the petition, and testified

that she had no role in the preparation of any of the documents.  Rather, Kimberley

testified that, on January 30, 2012, she simply took the credit counseling course at

Pinnacle's offices and then went home.  According to Kimberley, she assumed that

Burton and his staff were drafting the documents for her based on her credit report and

the information she had previously provided in connection with the loan modifications.

She testified that she in no way participated in helping to prepare the bankruptcy

petition on January 30 or 31, 2012, and did not go over any of the documents with

Burton:

> Q.    So how many times did you meet in Pinnacle's offices to go over
> the bankruptcy petition preparation?
>
> A.    I have never gone over a bankruptcy petition paperwork.  I had a
> hour-long meeting in an office where I decided that I would do the
> Chapter 13 because it was the only way.  And then I sat in to an
> office for about another forty-five minutes doing a credit counseling
> thing on the phone, and I went home.
>
> Q.    And when was this -- what date?
>
> A.    On the 30th.

Trial Tr. 2 19:13-21.

On January 31, a Pinnacle employee drove to Kimberley's place of work to have

her sign the petition.  Because she did not want the employee to come to her office,

Kimberley signed the documents on the hood of her car.  Kimberley did not read or

review the documents before they were signed; each page requiring her signature was

marked, and she went through the documents only to sign where indicated.  She was

not given a signed or unsigned copy of the petition.

Through their pleadings and Burton's testimony, the Defendants have concocted

a different story.  In their response to the Motion to Disgorge, the Defendants claimed
that Kimberley came to Pinnacle's offices on January 6, 10, 13, 19, 26, and 31, 2012 to
complete the bankruptcy petition, and Burton reaffirmed that representation at trial.  In
answer to whether Kimberley was lying or mistaken that the decision to file for
bankruptcy was not actually made until January 30, Burton's almost nonsensical
response was: "Well, I mean, each meeting would have been different, you know?  And
again, it was at the same time.  She, as the client, is hoping and praying that the bank's
going to give her some sort of resolution on a loan modification."  Trial Tr. 4 182:17-20.

According to the Defendants, Pinnacle employees spent between 25-30 hours
working on Kimberley's bankruptcy petition.  Burton testified that, during his meetings
with Kimberley, she specifically directed him to choose the federal exemptions on
Schedule C.  And he testified that each statutory citation in support of the claimed
exemptions was provided at Kimberley's direction.  He also maintained that Kimberley
instructed him to report "to be determined" as her income on the statement of financial
affairs, as there was a problem with her tax returns and they would need to be
amended.  According to Burton, Kimberly actually signed most of the petition at
Pinnacle's offices on January 31, and an employee drove to Kimberley's workplace later
that day only because one or two signatures were missing.

In the response to the Motion to Disgorge, the Defendants initially claimed that
Kimberley was provided with two copies of the signed petition and that Kimberley
herself filed the petition on January 31.  In the Defendants' post-trial brief, however, they
allege that Kimberley was given an *unsigned* copy of the petition when she signed the
documents on the 31st.  And Burton admitted at trial that the petition was hand-

delivered to the Court by Pinnacle staff.

Kimberley's testimony was extremely credible, while the Defendants' assertions in the pleadings and Burton's testimony regarding only "one or two" missing signatures was clearly concocted.  Accordingly, the Court finds that the Defendants prepared Kimberley's bankruptcy petition on January 30 and/or 31, 2012 with no assistance from Kimberley; Patria Santos drove the completed documents to Kimberley's work for her signatures,[22] and Santos then drove to the Court where she hand-delivered the signed petition and the filing fee to the clerk's office.[23]  Kimberley did not receive a copy of any of the documents at the time they were signed.

The voluntary petition, schedules, statement of financial affairs, certification of § 342 notice, and Official Form 19 are each accompanied by a petition preparer certification signed by Burton on behalf of "Robert Burton – Pinnacle Financial Consulting, LLC."  Burton's full social security number is listed on each petition preparer certification.  The statement of compliance with the credit counseling certificate, creditor matrix, verification of creditor matrix, means test form, and statement of social security number are not accompanied by petition preparer certifications.

On January 31, 2013, the Court issued an Order to Update, requiring the Chapter 13 plan and evidence of current liability and property insurance to be filed on or before February 14, 2012.  In response, Kimberley prepared and filed a request to extend that

---

[22] Although Kimberley thought it may have been another Pinnacle employee that brought the documents to her workplace for signatures, she admitted that it could have been Santos. According to the Court's records, Santos hand-delivered the petition to the Court.

[23] It appears that, on January 31, Daniel cashed a check written by Kimberley and payable to him, which Daniel used to purchase a money order for the filing fee as well as to pay Pinnacle's $500 petition preparation fee.  Daniel brought the filing fee and the petition preparation fee to Pinnacle's offices on Kimberley's behalf.

deadline, indicating that she was meeting with legal counsel to assist her in the case. On May 23, 2012, Attorney Mark Kasilowski filed a notice of appearance in the case; his fees have been allowed in the amount of $2,200. The case has not been dismissed, and the Chapter 13 plan was confirmed on November 1, 2012.

4.    In re Felix and Elizabeth Rosario, Chapter 13 Case No. 11-43200

Elizabeth Rosario first contacted Pinnacle in early May 2011 seeking assistance in negotiating a mortgage loan modification. During her first meeting with Burton, Elizabeth told him that she had previously filed two bankruptcy cases. She also explained that she and her husband, Felix Rosario, had previously negotiated a loan modification on their primary residence, but had fallen behind on those payments and hoped to obtain a further modification. At the conclusion of the meeting, Burton and Elizabeth agreed that Pinnacle would attempt to negotiate a loan modification for a fee of $2,000, payable in four monthly installments of $500 each. Elizabeth made two of those payments – one $500 payment in mid-May and another $500 payment in early July.

Ultimately, the negotiations for a further mortgage loan modification failed and a decision was made to file a Chapter 13 case in order to forestall foreclosure. The parties starkly disagree on the history of what followed. They disagree on what was said to whom, who was in attendance during those discussions, what services Pinnacle promised to perform, the charges for those services, how the petition was prepared, and even who filed the petition. Frankly, after the testimony was completed, the Court concluded that neither party (the Rosarios on the one hand; Burton and Pinnacle on the other) was entitled to an award for credibility.

But indisputable is that the Rosarios' bankruptcy petition was filed on July 27, 2011. The voluntary petition, schedules, statement of financial affairs, certification of § 342 notice, and Official Form 19 are each accompanied by a petition preparer certification, signed by Burton on behalf of "Robert Burton Pinnacle." But Burton's full social security number is not listed on any of the petition preparer certifications. And the statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, statement of social security number, and means test form are not accompanied by petition preparer certifications.[24]

### 5.    In re Eugenia Lopez, Chapter 7 Case No. 11-45202

Eugenia Lopez paid the Defendants $750 to prepare a Chapter 7 bankruptcy petition, which was filed on December 19, 2011. Although Lopez did not testify at trial, the Court relies on the admitted evidence, the Court's own records, and the trial testimony to evaluate the Trustee's allegations with regard to the Lopez case.

Burton says that the preparation of the bankruptcy petition followed the same intake, interview, and petition preparation process testified to as Pinnacle's general

---

[24] Because the Chapter 13 plan and evidence of insurance for the Rosarios' real property was not filed with the petition, the Court issued an Order to Update, setting August 10, 2011 as the deadline for filing the missing documents. The parties continue their respective narratives by disagreeing on who said what to whom about those missing documents and who was to blame for the case being subsequently dismissed. At some point, the Rosarios retained Attorney Stephen Teel, at whose suggestion the Rosarios filed a police report. Charges for forgery and larceny by theft over $250 were brought against Burton. Burton was found not guilty, but did not let the matter lie. Shortly before trial in this matter, Burton filed a complaint in the District Court against the Rosarios, Attorney Teel, the City of Lawrence, and members of the Lawrence Police Department, alleging civil rights violations under 42 U.S.C. §1983. And just days before trial in this matter, Martin Corona attempted to serve the complaint on the Rosarios at their home (with Burton visible in a nearby automobile) under circumstances that the Rosarios contended smacked of intimidation. Finally, however, the Rosarios and Burton agreed to withdraw all of their claims against one another. The Trustee was not a party to that "settlement" and has not withdrawn any claims against the Defendants. And although the case was later reopened, it was again dismissed at the request of the Chapter 13 trustee on account of the Rosarios' failure to make their plan payments.

practice, which included providing written materials to the debtor and directing her to websites to obtain answers to questions while the documents were prepared in Burton's office.  And, as testified to by Santos and Rodriguez, the Court finds it likely that the process also included discussions between Burton and the debtor regarding those materials.

Burton testified that Schedule C was completed by Lopez using the provided materials to assist her in electing (pursuant to § 522(b)(2)) the exemptions provided under § 522(d), in listing her items of personal property, and in telling Burton the specific statutory citations to be used for exempting that property.  When obvious errors in the petition were identified (for example, problems with Lopez's reported income), Burton claimed that the errors were not his, but Lopez's, since he was simply entering information as she directed.  According to Burton, he charged Lopez $750 for the petition preparation because she required the presence of a Spanish translator at all meetings. No written fee agreement was produced.

The Defendants claim that Pinnacle employees spent between 35-40 hours on Lopez's case.  At trial, Burton adopted the claim made by the Defendants (in response to the Trustee's Motion to Disgorge) that Lopez came to Pinnacle's offices on December 6, 9, 13, 16, and 19, 2011 to work on and complete her petition.  The signatures on the voluntary petition, schedules, and statements, however, are all dated December 12, 2011, while the credit counseling certificate is dated December 14.  As the documents were all printed (and thus completed) on December 12, 2011, Lopez could not have been in Pinnacle's office to complete preparation of those documents on December 13, 16, or 19.

The voluntary petition, schedules, statement of financial affairs, and certification of § 342 notice are each accompanied by a petition preparer certification signed by Burton on behalf of "Robert Burton Pinnacle." Burton's full social security number is not listed on any of the petition preparer certifications. The statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, statement of social security number, means test form, and statement of intention are not accompanied by petition preparer certifications. And the certification of completion of the financial management course, signed by Lopez and dated February 1, 2012, appears to have been completed by the Defendants, but is not accompanied by a petition preparer certification.

Burton says that Lopez was provided with two copies of the petition, and that Lopez filed the petition with the Court. The Court is unable to discern from its own records how the documents were delivered to the Court. The December 14, 2011 money order bearing Lopez's name used to pay the filing fee, however, bears the standard mark used by the clerk's office to indicate that it was received through the mail. Burton testified that Pinnacle frequently sends petitions and filing fees to the Court by mail. And the Court finds that it is more likely that Lopez herself did not hand deliver the petition and filing fee to the Court. Rather, Lopez gave the money order for the filing fee to a Pinnacle employee; the petition, along with the filing fee, was then mailed to the Court from Pinnacle's offices by a Pinnacle employee.

Lopez received a Chapter 7 discharge on March 21, 2012. The case remains open pending a resolution of the matters currently before the Court.

6.     In re Ramon A. Javier, Chapter 13 Case No. 12-40006

Ramon Javier paid the Defendants $750 to prepare a Chapter 13 bankruptcy petition, filed on January 3, 2012.[25]   Javier did not testify at trial; however, the Court relies on the admitted evidence, the Court's own records, and the trial testimony to evaluate the Trustee's claims with regard to this case.

According to Burton, Javier independently decided to file a case under Chapter 13 and came to Pinnacle for assistance with that filing.   He says that Javier was charged $750 for the petition preparation because he required the presence of a Spanish-speaking translator at each meeting.   Burton testified that he obtained Javier's credit report (although none was produced at trial) and that the petition was completed over several meetings, with Javier and Burton going through the petition line by line and Burton entering information at Javier's direction.   But at least with regard to Schedule I, Javier did not direct Burton as to the entries on that document, since Burton testified that he completed the schedule using the pay stubs and other information provided to him by Javier.   The Trustee has highlighted apparent errors in Javier's schedules and statements (for instance, Schedules B and C are blank, no priority or unsecured creditors are listed, and only one creditor is listed on the mailing matrix).   Burton says that these errors are the result of his entering the information as directed by Javier.

In the response to the Trustee's Motion to Disgorge, the Defendants say that Javier met with Burton at Pinnacle's offices on December 7, 9, 16, 22 and 29, 2011, and January 3, 2012 to complete the petition.   They further assert that Pinnacle employees spent 35-40 hours working on Javier's case – quite a curious claim in light of the

---

[25] The case was originally assigned to Judge Hoffman, but was transferred to this Court on February 28, 2012.

wholesale absence of data in the petition.

In the Defendants' response to the Motion to Disgorge, the Defendants also claimed that Javier was given two copies of the petition and related documents – one for his records and one for filing – and that Javier filed the documents with the Court on January 3.  In response to the Amended Motion to Disgorge, however, the Defendants admit that either Burton or another Pinnacle employee collected the money order for the filing fee from Javier and filed the petition and filing fee with the Court.

The voluntary petition, schedules, statement of financial affairs, certification of § 342 notice, and Official Form 19 are each accompanied by a petition preparer certification signed by Burton on behalf of "Robert Burton Pinnacle Financial Consulting LLC."  Burton's full social security number is listed on some of the petition preparer certifications, but not others.[26]  The statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, statement of social security number, and means test form are not accompanied by petition preparer certifications.

On January 4, 2012, the Court issued an Order to Update, requiring Javier to file a Chapter 13 plan by January 18, 2012.  The plan was not filed, and the case was dismissed on January 31.  The case remains open pending a resolution of the matters presently before the Court.

7.   In re Ruben Morillo, Chapter 7 Case No. 12-40334

Ruben Morillo paid the Defendants $750 to prepare his Chapter 7 petition, filed

---

[26] Only the last four digits of the social security number appear on the petition preparer certifications attached to the schedules and the statement of financial affairs.

with the Court on January 31, 2012.[27]  Morillo did not testify at trial; however, the Court relies on the admitted evidence, the Court's own records, and the trial testimony to evaluate the Trustee's claims with regard to the Morillo case.

Burton testified that the preparation of Morillo's petition followed the intake, interview, and petition preparation process testified to as the Defendants' regular practice.  According to Burton, the petition, schedules, and statements were prepared line-by-line, at Morillo's direction, while a Pinnacle employee provided Spanish-English translation for Burton and the client.   For example, Burton testified that Morillo specifically instructed him to check the box choosing to claim his exemptions under § 522(b)(2) and that Morillo specifically instructed him with respect to each claimed exemption on Schedule C.  According to Burton, Morillo directed Burton as to which statutory citations to include in support of the claimed exemptions "based on documents that [the Defendants] gave him . . . ."  Trial Tr. 5 72:16-17.  However, in contrast to the Defendants' insistence that the documents were prepared only at Morillo's specific direction, Burton admitted that Morillo's Schedule F was "quite possibly" prepared using Morillo's credit report.  Trial Tr. 5 65:10-12.

With regard to errors identified in the documents (for example, a business not disclosed on the statement of financial affairs), Burton explained that he simply completed the documents according to Morillo's direction, and that it was not his practice to correct bankruptcy clients even if the client gave an obviously incorrect answer.

According to the Defendants, Pinnacle staff spent between 35-40 hours on

---

[27] The case was originally assigned to Judge Hoffman.  On February 28, 2012, Judge Hoffman transferred the case to this Court.

Morillo's case.   Reaffirming and adopting the representations in the Defendants' response to the Motion to Disgorge, Burton testified that Morillo came to Pinnacle's offices on January 6, 10, 13, 19, 26, and 31, 2012 to complete and sign the petition. The signatures on the petition, schedules, and statements, however, are all dated December 13, 2011, almost one month *before* the Defendants say Morillo first met with Burton to work on the documents.   Burton tried to explain this discrepancy first by claiming that the dates listed in the Defendants' response were a "rough estimate."  Trial Tr. 5 23:22.  And Burton then attempted to justify the differences in dates by claiming that the documents were printed and signed on December 13, 2011, but that Morillo did not obtain a money order for the filing fee until January 31, 2012.  Even if that were true, Morillo could not have been in Pinnacle's offices on any of the dates claimed by the Defendants, as the documents were all completed and signed prior to the first date listed.

The Defendants also claimed, in their response to the Motion to Disgorge, that Morillo was given two copies of his completed and signed documents – one copy for his records and one for filing with the Court.  The Defendants stated in the response that Morillo filed the petition and related documents with the Court on January 31, 2012. And at trial, Burton testified that the documents may have been mailed from Pinnacle's offices, because most clients "have us fill out the envelopes and we drop it in our mailbox."  Trial Tr. 5 20:21-24.

In fact, Morillo's petition and filing fee were received by the clerk's office at 2:28 p.m. on January 31, only 6 minutes after the petition in the Morin case was received by the clerk's office and which the Defendants acknowledge was *hand* delivered.   In

addition, the money order used to pay the filing fee in the <u>Morillo</u> case does not bear the standard clerk's office mark indicating that it was received in the mail, and Court records indicate that Patria Santos hand-delivered Morillo's petition and filing fee to the Court on January 31, 2012.  <u>See</u> ECF No. 35 (private docket entry).

The voluntary petition, schedules, statement of financial affairs, certification of § 342 notice, and Official Form 19 are each accompanied by a petition preparer certification signed by Burton on behalf of "Robert Burton Pinnacle."  Burton's full social security number is not listed on any of the petition preparer certifications.  The statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, means test form, and statement of social security number were not accompanied by petition preparer certifications.  The certification of completion of the financial management course, signed by Morillo and dated March 19, 2012, appears to have been generated and completed using the Defendants' software, but is also not accompanied by a petition preparer certification.

Although a signed certification of completion of the credit counseling course was filed with the petition, indicating that Morillo had received a credit counseling briefing within 180 days of the petition date, the credit counseling certificate itself was not filed with the petition.  Accordingly, on January 31, 2012, the Court issued an Order to Update, requiring the filing of the certificate on or before February 14, 2012.  Burton then drafted, on Morillo's behalf, a response to the Order to Update, signed by Morillo and filed with the Court (together with the credit counseling certificate) on February 10. Burton did not identify himself as having prepared that document.

Morillo received his Chapter 7 discharge on May 7, 2012.  The case remains

open pending a resolution of the matters presently before the Court.

## II.      POSITIONS OF THE PARTIES

Initially, the focus of the inquiries in these pending cases (with the exception of the Rosario case) was on the reasonableness of the fees charged by the Defendants for bankruptcy petition preparation and whether some or all of those fees must be disgorged, pursuant to § 110(h)(3)(A)(i), as exceeding the value of services rendered. In the Amended Motions to Disgorge and the Adversary Proceeding, however, the Trustee's investigation and focus shifted to a more global concern about the Defendants' alleged violations of § 110.

In his post-trial brief, the Trustee questions Burton's credibility, arguing that various discrepancies evidence Burton's "reckless disregard for the truth at trial and in the pleadings that were filed by him and Pinnacle." Trustee Post-trial Brief 8 ¶ 15. The Trustee also maintains that fines and sanctions for specific violations of § 110, as well as orders requiring the disgorgement of all fees, are warranted in each of these cases. In addition, the Trustee contends that the Defendants' § 110 violations and continuing unauthorized practice of law warrant the entry of an order enjoining them from preparing bankruptcy petitions in this District in the future.

### A.      Reasonableness of Fees Charged by the Defendants

In the Trustee's view, the Defendants have failed to carry their burden of demonstrating the reasonableness of the fees charged in these cases, particularly in light of the $20 per hour maximum fee found reasonable for bankruptcy petition preparers in this District in Marshall v. Bourque (In re Hartman), 208 B.R. 768, 780

(Bankr. D. Mass. 1997), and <u>Hannigan v. Marshall (In re Bonarrigo)</u>, 282 B.R. 101, 107 (D. Mass. 2002). Given the Trustee's assessment that the hours the Defendants claim to have spent in each of the debtors' cases were not supported by testimony or corroborated by the evidence, the Trustee asks the Court to order disgorgement of the excess and unreasonable fees charged in each case (presumably as an alternative to total disallowance).

The Defendants, however, reaffirm the representations made regarding the number of hours spent on each debtor's case as set forth in their various responses to the Trustee's motions. The Defendants say that the "Pinnacle System" is time and labor intensive, involving "organizing financial materials, obtaining and reviewing credit bureau reports, coordinating the pre-bankruptcy credit counseling course, preparing the entire Pro Se Bankruptcy Petition, and preparing materials for the debtor in advance of their [sic] 341 meeting," Def. Post-trial Brief 46-47, and requiring multiple, time-intensive meetings between the client and Burton (and in many cases, a translator) as the petition is completed line by line. Moreover, the Defendants argue, a reasonable fee for their services must include consideration of the clients' use of Pinnacle's conference room, internet, telephone, and fax services, the printing of multiple copies of various documents and the client's file, and the costs of mailing documents to the Court.

The Defendants claim that the fees charged in each case were justified because "[t]he 'Pinnacle System' is unlike any other combination of services evaluated by any other court involving petition preparer fees. . . . The 'Pinnacle System' *is* the inherent value of service." Def. Post-trial Brief 47. According to the Defendants, since the profession of "typist" has become obsolete since the enactment of § 110 in 1994, "the

level of petition preparation services provided by Pinnacle were [sic] not likely contemplated when Section 110 was established." Id. at 55. The Defendants say that their services are worth more than those of other petition preparers, because they are addressing changes in demographics and technology and attempting to "professionalize the Bankruptcy petition preparation industry." Id.

The Defendants further maintain that the Court should consider Burton's law degree and "substantive bankruptcy education," as well as his work experience in law firms and in the operation of his own business, and conclude that the Defendants' reasonable compensation "should reflect [Burton's] considerable training and experience." Id. at 56. And the Defendants raise a "public policy" argument, urging the Court to consider that the Defendants serve a needy community. The Defendants argue that "[i]t is good public policy to acknowledge that debtors need an alternative to an attorney, and the Court, the U.S. Trustee, and the public all directly benefit from the service that Burton and Pinnacle provides." Id. at 57.

## B.   Legal Advice

The Trustee maintains that the Defendants violated § 110(e)(2) by offering legal advice to each of the debtors. According to the Trustee, Burton's legal advice included counseling regarding: whether to file a bankruptcy petition and which chapter was appropriate, whether debts would be discharged, whether the debtor would be able to retain property after filing, how to characterize the nature of the debtor's property interests and how to characterize debts, and general advice concerning bankruptcy procedures and rights.

The Defendants dispute several of the Trustee's allegations in the context of

specific cases.   The Defendants categorically deny giving any legal advice to the Lacroixs.   They note that William Lacroix previously filed a bankruptcy case, testified that he was "99% sure" he wanted to file under Chapter 7 before he met with Burton, and understood what an exemption was.   According to the Defendants, it was not Burton, but William Lacroix, who selected the exemptions and explained them to Nicole. The Defendants claim that the Lacroixs were not given legal advice; rather, the Lacroixs used the various materials they were given to direct the preparation of their petition.

With regard to the <u>Morin</u> case, the Defendants claim that Kimberley decided to file a bankruptcy case on her own volition, and that it was Attorney Guerrero, and not Burton or another Pinnacle employee, that suggested she file the case.   The Defendants also maintain that Kimberley's own testimony confirmed that Burton did not provide advice on how to complete the forms, on what exemptions to take, or regarding bankruptcy procedure or practice.

In the <u>Rosario</u> case, the Defendants say that Burton never advised the Rosarios as to whether to file a bankruptcy petition or under which chapter to file, maintaining that it was Elizabeth Rosario who brought up the need to file a Chapter 13 case.   And the Defendants say they did not advise the Rosarios during the petition preparation process, because they merely used the Rosarios' previous bankruptcy petitions and "updated the information at the direction of the Rosarios."   Def. Post-trial Brief 32.

The Defendants also argue extensively that the disclosures given to the debtors, both orally and in writing, unambiguously disclosed that Burton was not an attorney and that Pinnacle was not a law firm, and they say that each debtor acknowledged that disclosure by signing a variety of documents explaining that neither Burton nor other

Pinnacle employees could provide legal advice.  And in those cases where the debtors testified that they believed Burton was an attorney, the Defendants say that those debtors were repeatedly informed that he was not; thus, any belief that Burton was licensed to practice law resulted from their own misunderstanding.  Accordingly, the Defendants claim, they can be differentiated from the petition preparers in cases like Bonarrigo, where the defendant petition preparers held themselves out to be lawyers when they were not.

### C.     The Specific Provisions of § 110

The Trustee argues that Burton violated §§ 110(b)(1) and (c) in the Moya, Lacroix, and Morillo cases by failing to identify the Defendants on each document prepared on the debtors' behalf.  The Trustee argues that, pursuant to § 110(l)(1), Burton and Pinnacle should be charged the maximum fine of $500 for each failure to comply with §§ 110(b)(1) and (c).

The Defendants do not address the Trustee's arguments head-on, failing to refute the Trustee's allegations with respect to the various documents filed in several cases without any indication that the documents were prepared by the Defendants. Instead, the Defendants address their arguments only to those instances where Burton failed to provide a full social security number on the petition preparer certifications.  In those cases, the Defendants say, Burton provided only the last four digits of his social security number because an employee in the bankruptcy court clerk's office of the Worcester Division had suggested he omit the complete number.  According to the Defendants, after the Trustee suggested this was a violation of § 110, Burton again began putting his full social security number on petition preparer certifications.

49

The Trustee asks the Court to impose fines for the Defendants' failure – in, at least, the Moya, Lacroix, Morin, and Rosario cases –  to provide copies of all documents to the clients at the time the documents were signed, as required by § 110(d).  At trial, and in the responses to the Trustee's pleadings, the Defendants maintained that clients *were* provided copies of each document at the time of signing.

The Trustee further argues that Burton's use of the suffix "J.D." on his business card and on the Pinnacle website, as well as the description of Burton as a law school graduate, violates §110(f), which prohibits the use of the word "legal" or any similar term in petition preparer advertisements.   The Defendants disagree, maintaining that they "have demonstrated good faith compliance" with § 110(f), as evidenced by Pinnacle's name change from "Pinnacle Financial and Legal Solutions LLC" following earlier concerns raised by the United States trustee's office.   Def. Post-trial Brief 44.   The Defendants also claim that Burton stopped using the initials "J.D." on his petition preparer certifications at the request of the Court during a hearing in March 2011.

With regard to the use of "J.D." after his name on the Pinnacle website and business card, Burton notes that he is in fact a law school graduate and holds a juris doctorate degree.  Thus, since Pinnacle

> assists in the preparation of a variety of documents of a 'legal' nature, and provides a multitude of financial services to its clients[, i]t is honest and relevant that potential clients know that Burton is an educated man. . . .  Burton does in fact have many years of experience as a law school graduate and as a paralegal.  These are important factors that consumers should know when selecting a bankruptcy petition preparer.

Id. at 44.  According to the Defendants, even if clients are under the initial impression that Burton is an attorney, they are informed to the contrary, both verbally and in writing, when they come to Pinnacle's offices.

The Trustee also claims that, by taking physical possession of the money orders for filing fees in the Moya, Lacroix, Morin, Rosario, Javier, and Morillo cases, the Defendants violated § 110(g).   The Defendants respond by arguing that the intent of § 110(g) was not to prohibit a bankruptcy petition preparer from transmitting a debtor's money order for the filing fee with the petition, but to prevent petition preparers from handling cash or controlling the timing of a bankruptcy filing.   According to the Defendants, they filed the money orders with the petitions as "an ancillary and beneficial service" provided by Pinnacle as part of its "mailing services."   Def. Post-trial Brief 45. The Defendants maintain that there is no evidence that accepting the clients' money orders in these cases gave them control over the timing of the filing of any petition, and contend that the Trustee's "interpretation and application of Section 110(g) is misplaced and unsupported." Id. at 46.

The Trustee additionally claims that by failing to disclose *all* fees received from the debtors within the 12 months prior to the filing of the petitions (including those fees not charged for petition preparation), the Defendants violated § 110(h)(2) in the Moya, Morin, and Rosario cases.   The Defendants respond that the Trustee has taken the statutory language of § 110(h)(2) out of context.   According to the Defendants, they were required only to disclose those fees related to "consultation concerning debt consolidation, relief under bankruptcy law or preparation of a petition in bankruptcy," which they did. Def. Post-trial Brief 40, 42.   Accordingly, because they were not required to disclose non-petition preparer fees, the Defendants say they have not violated § 110(h)(2).

### D.      Fines, Sanctions, and Injunctive Relief

The Trustee argues that, in addition to the fines that may be imposed pursuant to § 110(l)(1) for violations of subsections (b)-(h), the Court should sanction the Defendants under § 110(i)(1) because they engaged in fraudulent, unfair, and deceptive acts.   According to the Trustee, the Defendants acted fraudulently, deceptively, or unfairly in each case in which Burton provided legal advice or engaged in the unauthorized practice of law, as such advice or practice in and of itself constitutes a fraudulent, deceptive, or unfair act within the meaning of § 110(i)(1).   The Trustee also contends that, in cases where the debtors were previously loan modification clients, the Defendants' advance acceptance of fees for loan modification services violated state and federal laws and regulations and, therefore, constituted unfair or deceptive acts.

Reiterating the argument that, by engaging in the unauthorized practice of law, the Defendants engaged in fraudulent, deceptive, or unfair conduct, the Trustee maintains that a permanent injunction against the Defendants acting as bankruptcy petition preparers in this District is warranted under § 110(j)(2).   The Trustee asserts that the Defendants have continually engaged in conduct that violates § 110 and that there is no adequate remedy at law to prevent the Defendants from engaging in such conduct in future cases.   Accordingly, the Trustee argues, a permanent injunction against preparing bankruptcy petitions is warranted pursuant to § 110(j)(2)(B), and is especially appropriate in light of Burton's "cavalier attitude . . . with respect to the multiple violations of § 110, the reckless disregard for the truth demonstrated in the pleadings filed by the Defendants . . . and in the testimony of Burton affirming those pleadings."   Trustee Post-trial Brief 46.   In the alternative, the Trustee urges the Court

to, at the least, enjoin Burton, Pinnacle, and Pinnacle employees and agents from engaging in any further conduct that violates § 110.

III.    DISCUSSION

A.    **Section 110: Background and Purpose**

Section 110 governs the conduct of "bankruptcy petition preparers," defined by the statute as "a person, other than an attorney for the debtor or an employee of such attorney . . ., who prepares for compensation a document for filing."   11 U.S.C. § 110(a)(1).   Because both Burton and Pinnacle received compensation to prepare bankruptcy documents for filing, both qualify as "bankruptcy petition preparers" under § 110.[28]

Section 110 contains both prescriptive and proscriptive provisions.   The statute *requires* bankruptcy petition preparers to: (1) sign and identify themselves on documents prepared for filing; (2) provide clients with a prescribed notice prior to preparing any document or accepting a fee; (3) provide clients with copies of documents at the time of signing; and (4) disclose all fees received from the debtor within 1 year preceding the commencement of the case and any unpaid fees charged to the debtor. 11 U.S.C. §§ 110(b), (c), (d), (h)(2).   The statute also *prohibits* bankruptcy petition

---

[28] Under the Bankruptcy Code, a "person" is defined to include a corporation, which in turn includes a limited liability company such as Pinnacle.  See 11 U.S.C. § 101(41).  Thus, an LLC that receives compensation for bankruptcy petition preparation is a "bankruptcy petition preparer" under § 110(a)(1).  See, eg., Gargula v. Miller (In re Bowyer), -- B.R. --, Bankr. No. 11-31568 HCD, Adv. No. 11-3043, 2013 WL 1141545, *11 (Bankr. N.D. Ind. March 4, 2013) (citing Frankfort Digital Servs., Ltd. v. Kistler (In re Reynoso), 477 F.3d 1117, 1123-24 (9th Cir. 2007); In re Fraga, 210 B.R. 812, 817 (B.A.P. 9th Cir. 1997)) (limited liability company qualified as bankruptcy petition preparer under § 110); U.S. Trustee v. McIntire (In re Sanchez), 446 B.R. 531, 537 & n.4 (Bankr. D.N.M. 2011) (same).

preparers from: (1) signing documents on behalf of a debtor; (2) giving legal advice; (3) using the word "legal" or similar terms in advertising or advertising under any category that uses the word "legal" or a similar term; and (4) collecting or receiving payment from or on the debtor's behalf for filing fees.  11 U.S.C. §§ 110(e), (f), (g).  Violations of § 110 may warrant the disgorgement of all or part of a petition preparer's fee, the assessment of fines and sanctions, and the entry of injunctive relief.  See 11 U.S.C. §§ 110(h)(3)(B), (i), (j).

Congress first enacted § 110 in 1994 as:

a consumer protection measure to deter and provide remedies for perceived abuses and the unauthorized practice of law by an increasingly large number of nonlawyers who were advising and assisting debtors in filing bankruptcy petitions. *See* Lawrence P. King, *2 Collier on Bankruptcy,* ¶ 110.01 at 110–5 (15th ed. Revised 1996) (hereinafter referred to as "*Collier* "). As the Senate Report indicates, § 110 was "intended to police fraud and abuse by such preparers" by subjecting preparers to punishment for violations of the statute. S. Rep. No. 103-168, 103rd Cong., St. Sess. 51 (1993), 1994 U.S. Code Cong. & Admin. News 1994, 3340. The House Judiciary Report also contains the following statement of congressional intent:

Bankruptcy petition preparers not employed or supervised by any attorney have proliferated across the county. While it is permissible for a petition preparer to provide services *solely limited to typing,* far too many of them also attempt to provide legal advice and legal services to debtors. These preparers often *lack the necessary legal training and ethics regulation* to provide such services in an adequate and appropriate manner. These services may take unfair advantage of persons who are ignorant of their rights both inside and outside of the bankruptcy system.

H.R.Rep. No. 835, 103rd Cong., 2d Sess. 40–41 (1994), 1994 U.S. Code Cong. & Admin. News 1994 at 3365 (emphasis supplied).

Marshall v. Bourque (In re Hartman), 208 B.R. 768, 776 (Bankr. D. Mass. 1997).

Congress designed the statute to control the proliferation of "bankruptcy typing mills" which have "unfairly preyed upon" people who "do not speak

English or understand the bankruptcy system." 140 Cong. Rec. H10772 (daily ed. Oct. 4, 1994) (statement of Rep. Berman). The bill was also intended to protect individual debtors from "bankruptcy petition preparers who negligently or fraudulently prepare bankruptcy petitions." 140 Cong. Rec. H10771 (statement of Rep. Synar).

Patton v. Scholl, No. CIV. A. 98-5729, 1999 WL 431095, *6 (E.D. Pa. June 28, 1999).

Given the "fundamental differences between lawyer and nonlawyer petition preparers," U.S. Trustee v. PLA People's Law-Arizona, Inc. (In re Green), 197 B.R. 878, 879-80 (Bankr. D. Az. 1996), "one specific target of [§ 110] was the inherently dangerous unauthorized practice of law by petition preparers," who "were attempting to provide legal advice and services which were beyond their knowledge and competence," In re Guttierez, 248 B.R. 287, 295, 296 (Bankr. W.D. Tex. 2000).  The proliferation of bankruptcy petition preparers gave rise to a very real need for consumer protection:

> When a person retains a lawyer to assist with a bankruptcy filing, he or she gives the lawyer authority to act in his or her place or stead. This authority includes the responsibility, among others, of preparing, signing, and filing pleadings and appearing in court on the client's behalf. In exchange for this authority, the lawyer gives, affirmatively or through operation of law, certain assurances that the client's interests will be protected. First, by virtue of the lawyer's status as a lawyer, the client is given the assurance that the Bankruptcy Court will acknowledge that the lawyer is speaking on the client's behalf. No one, other than a lawyer, is afforded this privilege by the court. Second, the lawyer, again by virtue of his/her status as a lawyer, gives the client assurance of a minimal level of expertise in the law, as determined by an objective third party, to wit, the accredited integrated state bar association; every lawyer must be admitted to the bar, which requires one to pass the bar examination and a character and fitness review process. Third, the client is assured that the lawyer is subject to ethical obligations imposed by the [state's highest Court] and enforced by that Court . . . . And, finally, the client is given the assurance that there will be an avenue for recovery if the lawyer breaches his/her responsibilities to the client. Most lawyers maintain malpractice insurance against which the client may recover. And, in the event that the lawyer has no such coverage and certain other criteria is met, the bar association maintains a client security fund.

A nonlawyer petition preparer, however, cannot offer a client similar assurances. Nonlawyer document preparers are not admitted to practice before the Bankruptcy Court. As such, the Court will not acknowledge any attempt to speak on behalf of a debtor. Indeed, the debtor proceeds *pro se* when a nonlawyer petition preparer is used. Nonlawyer document preparers give no assurances of a minimal level of competence in the law. Indeed, there is no objective process whereby a petition preparer may become licensed. A nonlawyer petition preparer gives no assurance that his/her conduct is governed by any ethical guidelines because the nonlawyer petition preparation industry is not organized through a professional association nor is it self-policing. Other than § 110, there are no Arizona or federal statutes regulating the business of nonlawyer petition preparers. A nonlawyer petition preparer can give the client no means of recovery in the event the obligation to the client is breached, because there is neither malpractice (errors and omissions) insurance, surety bonds, nor an industry recovery fund.

Because a nonlawyer document preparer cannot give his/her clients adequate assurance that his/her interests will be protected through the course of a bankruptcy proceeding, society, speaking through Congress, has imposed limitations on the ability of nonlawyer petition preparers to act on behalf of debtors.

Green, 197 B.R. at 879-80.  See also, e.g., Fessenden v. Ireland (In re Hobbs), 213

B.R. 207, 211 (Bankr. D. Me. 1997).

Ironically, despite the consistent recognition of § 110's intended purpose to reign

in and regulate bankruptcy petition preparers, some petition preparers have used

congressional recognition of their existence to argue that § 110 legitimizes a new

"profession" of sorts.  U.S. Trustee v. Brown (In re Martin), 424 B.R. 496, 505 n.6

(Bankr. D.N.M. 2010).[29]  Here, despite the courts' continued and vociferous reiteration

that § 110 is clearly intended to circumscribe, and not legitimize, petition preparation

activities, the Defendants have persisted in arguing that the "Pinnacle System"

---

[29] See also U.S. Trustee v. Assaf (In re Briones-Coroy), 481 B.R. 685, 690 (Bankr. D. Colo. 2012); McDow v. Skinner (In re Jay), 446 B.R. 227, 238 (Bankr. E.D. Va. 2010); In re Bernales, 345 B.R. 206, 216-17 (Bankr. C.D. Cal. 2006); Guttierez, 248 B.R. at 297; Moore v. Jencks (In re Moore), 232 B.R. 1, 11 (Bankr. D. Me. 1999).

represents a professionalization of petition preparation.  Thus, the Defendants assert, allowing them to continue preparing bankruptcy petitions in the manner they have described is good public policy, because many of their clients would otherwise be unable to obtain filing assistance, owing to financial and language barriers.  This Court, as have many others, appreciates those problems which are and have been difficult to overcome.  The legal community has a professional and moral responsibility to find an appropriate way to assist these vulnerable individuals.  But the solution is not to provide them with an unauthorized, undereducated, and largely unregulated group of legal service providers.  Nor could this Court do so, even were it so inclined.  The Court is not empowered to authorize activities which Congress has eschewed in § 110.[30]

"[H]owever well-intended, the 'bankruptcy petition preparer' that offers anything more than a typing, data entry, or photocopying service is in violation of 11 U.S.C. § 110."  Briones-Coroy, 481 B.R. at 691.  And the Defendants here are not really providing a low-cost alternative to a licensed attorney.  In many cases, the fees charged by the Defendants nearly equal, and in some cases exceed, the fee required to obtain representation in a Chapter 7 case.

**B.     Section 110(e)(2), Prohibition Against Legal Advice, and the Unauthorized Practice of Law**

In 2005, Congress amended § 110(e) to explicitly prohibit petition preparers from giving legal advice.  Section 110(e)(2) now provides that:

> (2)     (A)     A bankruptcy petition preparer may not offer a potential bankruptcy debtor any legal advice, including any legal

---

[30] See Guttierez, 248 B.R. at 297 ("Congress explained that its purpose in enacting § 110 was *not* to authorize a new profession, but rather to provide a remedy against a growing number of non-attorneys who were rendering quasi-legal (and legal) services in bankruptcy cases to the detriment of both the bankruptcy system and the consuming public.").

advice described in subparagraph (B).

(B)    The legal advice referred to in subparagraph (A) includes advising the debtor—

    (i)    whether—

        (I)    to file a petition under this title; or

        (II)    commencing a case under chapter 7, 11, 12, or 13 is appropriate;

    (ii)    whether the debtor's debts will be discharged in a case under this title;

    (iii)    whether the debtor will be able to retain the debtor's home, car, or other property after commencing a case under this title;

    (iv)    concerning—

        (I)    the tax consequences of a case brought under this title; or

        (II)    the dischargeability of tax claims;

    (v)    whether the debtor may or should promise to repay debts to a creditor or enter into a reaffirmation agreement with a creditor to reaffirm a debt;

    (vi)    concerning how to characterize the nature of the debtor's interests in property or the debtor's debts; or

    (vii)    concerning bankruptcy procedures and rights.

11 U.S.C. § 110(e)(2). This "list is neither exclusive nor exhaustive. Rather, it is a set of examples explaining what constitutes legal advice." Bernales, 345 B.R. at 215.

In many respects, § 110(e)(2) is thematically nothing new. The offering of legal advice by a nonattorney bankruptcy petition preparer was "prohibited as a matter of case law previously," id., because giving such advice also runs afoul of state laws prohibiting the unauthorized practice of law. Since § 110's enactment, § 110(k) has

clarified that § 110 does not displace nonbankruptcy laws that otherwise limit a petition

preparer's lawful activities, "including rules and laws that prohibit the unauthorized

practice of law."  11 U.S.C. § 110(k); see also In re McDonald, 318 B.R. 37, 47 (Bankr.

E.D.N.Y. 2004) (while § 110(k) "does not specifically prohibit the unauthorized practice

of law, it makes clear that the prohibitions contained in the section do not preempt . . .

state rules, and laws that prohibit the unauthorized practice of law").  This Court has the

responsibility and authority not only to enforce the specific provisions of § 110, but also

to regulate the practice of law in cases pending before it.  See In re Powell, 266 B.R.

450, 452 (Bankr. N.D. Cal. 2001).[31]

Here, the law of the Commonwealth of Massachusetts governs.  Chimko v. Lucas

(In re Lucas), 317 B.R. 195 (D. Mass. 2004).  Pursuant to Massachusetts General Laws

("MGL") ch. 221, § 46A, only those individuals admitted to the bar may practice law in

the commonwealth:

> No individual, other than a member, in good standing, of the bar of this commonwealth shall practice law, or, by word, sign, letter, advertisement or otherwise, hold himself out as authorized, entitled, competent, qualified or able to practice law; provided, that a member of the bar, in good standing, of any other state may appear, by permission of the court, as attorney or counselor, in any case pending therein, if such other state grants like privileges to members of the bar, in good standing, of this commonwealth.

MGL ch. 221, § 46A.[32]

---

[31] See also, McDow v. Mancini (In re Johnson), Bankr. No. 12-14808-DER, Adv. No. 12-00408-DER, 2012, WL 5193964, *7 (Bankr. D. Md. Oct. 19, 2012); In re Howerton, No. 04-12819, 2004 WL 2757908, *3 (Bankr. M.D.N.C. Nov. 24, 2004); In re Moffett, 263 B.R. 805, 813 (Bankr. W.D. Ky. 2001); U.S. Trustee v. Tank (In re Stacy), 193 B.R. 31, 38 (Bankr. D. Ore. 1996).

[32] Of course, individuals may represent themselves – "[A]n individual who prosecutes his own action is not engaging in the practice of law."  LAS Collection Mgmt. v. Pagan, 858 N.E.2d 273, 276, 447 Mass. 847 (2006) (citing In re Opinion of the Justices, 194 N.E. 313, 289 Mass. 607,

The practice of law in Massachusetts is regulated by the judicial branch, which "has [the] power to license persons to practice law" and is "the sole arbiter of what constitutes the practice of law." Lowell Bar Ass'n v. Loeb (In re Loeb), 52 N.E. 2d 27, 30, 31, 315 Mass. 176 (1943).  "The purpose of the requirement of a license as a condition of the right to practice law, as in the instances of the physician, the insurance broker, the auctioneer and of others where licenses are required, is not to protect the practitioner, but to protect the public." In re Shoe Mfrs. Protective Ass'n, Inc., 3 N.E. 2d 746, 748, 295 Mass. 369 (1936).  Individuals who have not passed the bar are prohibited from practicing law in order to "protect[ ] the public from being advised and represented in legal matters by incompetent and unreliable persons, over whom the judicial department could exercise little control." Loeb, 52 N.E.2d at 31.[33]

Whether an activity constitutes the "practice of law" is a fact-specific question; "a comprehensive definition would be impossible to frame." Mass. Conveyancers Ass'n, Inc. v. Colonial Title & Escrow, Inc., 13 Mass. L. Rptr. 633, *6 (Mass. Super. 2001).[34]

---

614-15 (1935)).

[33] The practice of law by a corporation or other association is also generally prohibited, see MGL ch. 221, § 46.  Under Massachusetts law:

> no corporation or association shall draw agreements, or other legal documents not relating to its lawful business, or draw wills, or give legal advice in matters not relating to its lawful business, or practice law, or hold itself out in any manner as being entitled to do any of the foregoing acts, by or through any person orally or by advertisement, letter or circular.

MGL ch. 221, § 46; Shoe Mfrs., 3 N.E.2d at 747. The statute excepts professional organizations and limited liability companies organized by properly licensed attorneys.  Pinnacle does not fit within that exception.

[34] See also Hannigan v. Marshall (In re Bonarrigo), 282 B.R. 101, 105 (D. Mass. 2002); The Real Estate Bar Ass'n for Mass., Inc. v. Nat'l Real Estate Information Servs., 946 N.E.2d 665,673-74, 459 Mass. 512 (2011).

But the Massachusetts Supreme Judicial Court (the "SJC") has held that "the practice of law involves applying legal judgment to address a client's individualized needs." <u>Real Estate Bar Ass'n</u>, 946 N.E.2d at 674. The examination of statutes and judicial rulings for use in advising a client or "the rendering of legal opinions in circumstances where an individual will rely on that opinion" constitutes the practice of law. <u>Mass. Conveyancers</u>, 13 Mass. L. Rptr. 633, at *6. And, generally speaking, the practice of law includes:

> [d]irecting and managing the enforcement of legal claims and the establishment of the legal rights of others, where it is necessary to form and to act upon opinions as to what those rights are and as to the legal methods which must be adopted to enforce them, the practice of giving or furnishing legal advice as to such rights and methods and the practice, as an occupation, of drafting documents by which such rights are created, modified, surrendered or secured . . . .

<u>Real Estate Bar Ass'n</u>, 946 N.E.2d at 674 (quoting <u>Shoe Mfrs.</u>, 3 N.E. 2d at 748).

The preparation of documents with legal implications "does not automatically constitute the practice of law." <u>Real Estate Bar Ass'n.</u>, 946 N.E. 2d at 678. Whether drafting or preparation of such documents amounts to the practice of law depends on "the type of document, whether legal rights and obligations are being established, whether the document involves providing legal advice or a legal opinion, and whether the document is tailored to address a client's individual legal needs." <u>Id.</u>

For example, the SJC has held that simply preparing a bankruptcy reaffirmation agreement is not the practice of law, where the agreement is drafted by corporate counsel and is completed using predetermined mortgage terms inputted into the appropriate blank spaces. <u>In re Chimko</u>, 831 N.E. 2d 316, 321-22, 444 Mass. 743 (2005). In <u>Chimko</u>, the SJC analogized the completion of the reaffirmation form using the predetermined terms of a mortgage to a nonattorney's preparation of preprinted

income tax returns (which does not constitute the practice of law, see Loeb, 52 N.E. 2d 27), since there is no use of professional judgment in the application of legal principles to individual client needs and no advice on bankruptcy matters is given.  Chimko, 831 N.E.2d at 322.

Similarly, the SJC has held that the preparation of mortgage settlement statements and other related forms, which require filling in blank spaces with information provided by the lender, does not constitute the practice of law.  Real Estate Bar Ass'n, 946 N.E. 2d at 679.  In so holding, the SJC noted that, "[a]lthough there may be legal consequences that flow from filling out these forms, there is no legal advice or legal opinion being offered, and ultimate control over and responsibility for the content of those forms rests with [the client]."  Id. (citation omitted).

In contrast, however, the SJC has held that the preparation of deeds pertaining to real property *does* constitute the practice of law in Massachusetts, because "deeds pertaining to real property directly affect significant legal rights and obligations."  Real Estate Bar Ass'n., 946 N.E. 2d at 678 (citing Shoe Mfrs., 3 N.E. 2d at 748 ("drafting documents by which [legal] rights are created, modified, surrendered or secured [is an] aspect[ ] of the practice of law")); see also The Real Estate Bar Ass'n for Mass., Inc. v. ANADeeds, Inc., 2012 WL 7151297 (Mass. Super. Dec. 19, 2012).

Every debtor in a bankruptcy case is obligated to complete and file the appropriate bankruptcy Official Forms.  See Fed. R. Bankr. P. 1007.  The Official Forms, unlike the settlement statements or reaffirmation agreements discussed above, cannot be completed by merely copying data from another source into the forms without the use of legal judgment.  With the exception of the debtor's basic information (e.g.,

62

name, address, and social security number), virtually every entry requires some legal determination.  For instance, in order to complete Schedule A (Official Form 6A), the debtor (or the debtor's attorney) must make a legal determination as to whether the debtor has any "legal, equitable, or future" interests in real property, must characterize the nature of any interest in real property, and must determine the current value of the debtor's interest in any such property.  Similarly, to complete Schedule B (Official Form 6B), the debtor must determine whether she or he has any legal interests in personal property, the nature of any such interest, and the value of that property.

And Schedule C (Official Form 6C) most certainly cannot be completed without making a variety of complex legal determinations and decisions.  The debtor not only must have an understanding of the meaning of the term "exemption," but must also decide whether to claim exemptions under bankruptcy or non-bankruptcy exemption schemes, must determine which exemptions are available under the chosen statutory scheme (including the specific statutory citations for any claimed exemption), must ascertain whether, how, and to what extent the debtor's property qualifies for a particular exemption, must determine whether or not the entire asset or only a monetary interest in the property can be claimed as exempt, and must provide a value for both the exemption and the property itself.

To complete Schedules D, E, and F (Official Forms 6D, 6E, 6F), the debtor is required not only to disclose the identity of each of the debtor's creditors, but also determine whether each debt is secured or unsecured, whether the debt is entitled to priority under the Bankruptcy Code, and whether the debt is contingent, unliquidated, or disputed.  Completion of Schedule G (Official Form 6G) further requires the debtor to

63

determine whether he or she is a party to an executory contract or unexpired lease,[35] and to disclose the nature of the debtor's interest.  The remaining schedules and statements, particularly the statement of financial affairs (Official Form 7) and the means test forms (Official Forms 22A, 22B, 22C), require equally complex legal determinations for completion.

Accordingly, several activities performed by nonattorneys have universally been held to constitute the giving of legal advice or the unauthorized practice of law:

- Assisting in the completion of forms, schedules, and statements or determining where things are scheduled on forms.[36]

- Classifying debts or characterizing interests in property.[37]

- Supplying or recommending values for property or advising how to value property.[38]

- Choosing exemptions for the debtor, assisting with the choice of exemptions,

---

[35] Indeed, not the least of the debtor's problems is determining the proper definition of the term "executory contract" – a definition which is itself the subject of differing opinions in the legal community.  See James F. Queenan, Jr., Philip J. Hendel and Ingrid M. Hillinger, Chapter 11 Theory and Practice, A Guide to Reorganization §§ 17.03-17.08.

[36] See Briones-Coroy, 481 B.R. at 726; U.S. Trustee v. Lopano (In re Bagley), 433 B.R. 325, 333 (Bankr. D. Mont. 2010); In re Payne, 414 B.R. 111, 114 (Bankr. W.D. Ky. 2009); Howerton, 2004 WL 2757908 at *4; McDonald, 318 B.R. at 48; Bodenstein v. Shareef (In re Steward), 312 B.R. 172, 175 (Bankr. N.D. Ill. 2004); Meininger v. Burnworth (In re Landry), 268 B.R. 301, 304 (Bankr. M.D. Fla. 2001); Guttierez, 248 B.R. at 296; Staiano v. The File Aid of New Jersey (In re Bradshaw), 233 B.R. 315, 322 (Bankr. D.N.J. 1999); Ostrovsky v. Monroe (In re Ellingson), 230 B.R. 426, 433 (Bankr. D. Mont. 1999); Stacy, 193 B.R. at 39; In re Lyvers, 179 B.R. 837, 842 (Bankr. W.D. Ky. 1995).

[37] See Briones-Coroy, 481 B.R. at 726; Bagley, 433 B.R. at 433; Payne, 414 B.R. at 114; McDow v. Mayton, 379 B.R 601, 605 (E.D. Va. 2007); Howerton, 2004 WL 2757908 at *4; Bonarrigo, 282 B.R. at 106; In re Dunkle, 272 B.R. 450, 456 (Bankr. W.D. Pa. 2002); Guttierez, 248 B.R. at 296; Patton, 1999 WL 431095 at *7; In re Kaitangian, 218 B.R. 102, 112 (Bankr. S.D. Cal. 1998); Stacy, 193 B.R. at 39.

[38] See McDonald, 318 B.R. at 48; Bornarrigo, 282 B.R. at 106 (suggesting client use "yard sale" valuation); Stacy, 193 B.R. at 39.

or relying on a bankruptcy software program to choose the exemptions.[39]

- Providing a list of exemptions from which the debtor should choose or providing statutory citations to support claimed exemptions.[40]

- Preparing a Chapter 13 plan.[41]

- Correcting errors or omissions on the forms.[42]

And because the completion of bankruptcy forms entails a number of legal decisions, courts have held that a bankruptcy petition preparer's completion of the forms using summarized or recharacterized data obtained from the debtor through written questionnaires or worksheets also constitutes the giving of legal advice and the unauthorized practice of law. As one court explained:

> The use of questionnaires or worksheets in collecting the information for the [petition preparer] to use in preparing bankruptcy papers for filing has been criticized by this Court and others. Attempts through a questionnaire

---

[39] See Briones-Coroy, 481 B.R. at 723; In re Moore, 2012 WL 4659873, *10 (Bankr. E.D.N.Y. Sept. 28, 2012); Sanchez, 446 B.R. at 538; Bagley, 433 B.R. at 333; In re Evans, 413 B.R. 315, 325-26 (Bankr. E.D. Va. 2009); In re Rojero, 399 B.R. 913, 919 (Bankr. D.N.M. 2008); Turner v. Burnworth (In re Carrier), 363 B.R. 247, 253 (Bankr. M.D. Fla. 2006); Bernales, 345 B.R. at 225 Howerton, 2004 WL 2757908 at *4; McDonald, 318 B.R. at 48; In re Rose, 314 B.R. 663, 705 (Bankr. E.D. Tenn. 2004); Steward, 312 B.R. at 175; Dunkle, 272 B.R. at 454, 456; Bonarrigo, 282 B.R. at 106; Landry, 268 B.R. at 304; Moffett, 263 B.R. at 814; Guttierez, 248 B.R. at 296; Patton, 1999 WL 431095 at *7; Bradshaw, 233 B.R. at 322, 331; Moore v. Jencks, 232 B.R. at 8; Kaitangian, 218 B.R. at 112; Hobbs, 213 B.R. at 218; Stacy, 193 B.R. at 40.

[40] Jay, 446 B.R. at 250-51 (providing a list of exemptions from which debtors chose violated § 110); In re Baugh, 416 B.R. 905, 909 (Bankr. M.D. Ga. 2009); Payne, 414 B.R. at 114; In re Springs, 358 B.R. 236, 244 (Bankr. M.D.N.C. 2006); Moffett, 263 B.R. at 814; Ellingson, 230 B.R. at 435 ("simply by 'going over the codes' with and providing [the debtor] with the list of exemption statutes for the purpose of preparing bankruptcy schedules, and by explaining their effect, [BPP] engaged in the unauthorized practice of law."); Kaitangian, 218 B.R. at 110 ("advising of available exemptions from which to choose . . . requires the exercise of legal judgment beyond the capacity and knowledge of lay persons").

[41] In re van Dyke, 296 B.R. 591, 598 (Bankr. D. Mass. 2003); Bradshaw, 233 B.R. at 322, 331; Hobbs, 213 B.R. at 218; Stacy, 193 B.R. at 39.

[42] Payne, 414 B.R. at 114; Rose, 314 B.R. at 705; Steward, 312 B.R. at 175.

to "simplify" the questions posed and information required in the official bankruptcy forms usually leads to the exercise of judgment by the [petition preparer] in how best to accomplish that result, which in turn inevitably crosses the line by giving potential debtors guidance and advice on how to fill out the forms.  To the extent the questionnaire deviates in any way from the official forms, it likely constitutes unauthorized legal advice.

In re Doser, 281 B.R. 292, 309-10 (Bankr. D. Idaho 2002), aff'd 412 F.3d 1056 (9th Cir. 2005).  This rationale applies with equal force to the use of other sources, such as credit reports or "discussions" with the client, to glean information used to prepare the debtor's petition.  See Kaitangian, 218 B.R. at 110 ("Plugging in solicited information from questionnaires and personal interviews to a pre-packaged bankruptcy software program constitutes the unauthorized practice of law.").[43]

While pro se debtors are free to consult unlimited resources to assist them in completing the Official Forms, a bankruptcy petition preparer who provides selected written materials to the debtor or directs the debtor to websites for assistance in making legal decisions is essentially giving the debtor legal advice and engaging in the practice of law.  By directing the debtor to particular resources or materials, the petition preparer is "effectively suggest[ing] a specific form or course of action."  Stacy, 193 B.R. at 40.

The very act of directing a prospective debtor to review a particular section of a legal book in and of itself constitutes legal advice.  By focusing on one answer and excluding others, the bankruptcy petition preparer steps over the line.  As stated by the District Court, "Legal advice is legal advice, whether it comes directly from the petition preparer or indirectly via, for example, a bankruptcy treatise being recited by that preparer.  Persons seeking legal assistance tend to place their trust in an individual purporting

_____

[43] See also Briones-Coroy, 481 B.R. at 690; Moore, 2012 WL 4659873 at *10; Jay, 446 B.R. at 251 n. 22; Bagley, 433 B.R. at 333; Rojero, 399 B.R. at 920; Bernales, 345 B.R. at 216, 224-25; In re Tomlinson, 343 B.R. 400, 408 (E.D.N.Y. 2006); Rose, 314 B.R. at 706; Dunkle, 272 B.R. at 455-56; Moffett, 263 B.R. at 815; In re Gomez, 259 B.R. 379, 387 (Bankr. D. Colo. 2001); Guttierez, 248 B.R. at 296; Patton, 1999 WL 431095 at *7-8; Ellingson, 230 B.R. at 434; Hastings v. U.S. Trustee (In re Agyekum), 225 B.R. 695, 702 (B.A.P. 9th Cir. 1998).

to have expertise in that area."

Landry, 268 B.R. at 304 (quoting Florida Bar v. Brumbaugh, 355 So.2d 1186 (Fla. 1978)).[44]   The problems associated with providing materials to the debtors are compounded when that information is accompanied by the petition preparer's interpretation of the information and how to use it.   Guttierez, 248 B.R. at 296.   It is especially troubling when the information provided by the bankruptcy petition preparer is flatly wrong.   "In addition, it is unfair and deceptive to include these materials with a petition preparer's services because it gives the false impression that these documents are all that is required for the customer to decide whether to file and how to complete the forms."   In re Gilliam Moore, 283 B.R. 852, 863 (Bankr. E.D.N.C. 2002).

In addition to activities involving the completion of the bankruptcy forms, other examples of activities that constitute the giving of legal advice and the practice of law have been consistently identified by courts, including:

- Advising whether to file for bankruptcy or under which chapter to file, or explaining the differences between bankruptcy chapters to assist with the choice.[45]

- Explaining bankruptcy remedies and procedures.[46]

- Describing the benefits or effects of bankruptcy laws.[47]

---

[44] See also Gomez, 259 B.R. at 387 (by providing debtors with resources and directing them to websites the petition preparer endorsed the legal information); Doser, 281 B.R. at 306-09; Rose, 314 B.R. at 707 (legal advice does not have to be given orally; it can be conveyed through providing printed information that itself contains legal advice).

[45] See Mayton, 379 B.R at 605; McDonald, 318 B.R. at 48; Bonarrigo, 282 B.R. at 106; Dunkle, 272 B.R. at 456; Landry, 268 B.R. at 304; Guttierez, 248 B.R. at 296; Bradshaw, 233 B.R.  at 322, 330; Hobbs, 213 B.R. at 218; Stacy, 193 B.R. at 39.

[46] See Mayton, 379 B.R at 605; Carrier, 363 B.R. at 253; McDonald, 318 B.R. at 48; Bonarrigo, 282 B.R. at 106; Lyvers, 179 B.R. at 841; Payne, 114 B.R. at 414.

- Defining, explaining, or interpreting legal terms.[48]

- Summarizing bankruptcy laws and processes.[49]

And there is no question that drafting motions or responses for debtors to be filed with the court constitutes the unauthorized practice of law. Preparing motions or responses on a debtor's behalf requires the application of legal principles to a particular client's circumstances in order to secure or protect the clients' rights or benefits. As such, it falls squarely within the SJC's contemplation of what constitutes the practice of law. See Real Estate Bar Ass'n., 946 N.E. 2d at 678.[50]

The Defendants in this case have repeatedly stressed that they provide bankruptcy clients with several disclosures explaining that Burton is not a licensed attorney, that Pinnacle is not a law firm, and that none of Pinnacle's employees, including Burton, may provide legal advice. But those disclosures are "beside the point." Moore v. Jencks, 232 B.R. at 9. "If a license is needed to practice medicine, one who administers prescription drugs or provides medical treatment cannot defend the charge of practicing medicine without a license by showing that he repeatedly advised

---

[47] Rojero, 399 B.R. at 919 (telling debtors they could keep their home); Mayton, 379 B.R at 605 (advising whether debtor will be able to retain property); McDonald, 318 B.R. at 48; Bonarrigo, 282 B.R. at 106 (explaining discharge of debts); Bradshaw, 233 B.R. at 322, 331 (telling debtor the bankruptcy filing will stop an eviction proceeding); Stacy, 193 B.R. at 39.

[48] Bernales, 345 B.R. at 216, 222-23; Rose, 314 B.R. at 705; Steward, 312 B.R. at 175; Bonarrigo, 282 B.R. at 106; Bradshaw, 233 B.R. at 322, 331.

[49] Rose, 314 B.R. at 705.

[50] See also In re Amezcua, No. BR 12-21370 JTM, 2013 WL 272809, *4 (Bankr. D. Utah Jan. 18, 2013); Briones-Coroy, 481 B.R. at 723; Johnson, 2012 WL 5193964 at *6; Jay, 446 B.R. at 245-46; Mayton, 379 B.R. at 605; Carrier, 363 B.R. at 253; Powell, 266 B.R. at 452; Bradshaw, 233 B.R. at 322, 331; Stacy, 193 B.R. at 39; Lyvers, 179 B.R. at 842.

his patient that he was not a doctor."  Id.[51]   It is equally irrelevant that many of Pinnacle's clients are satisfied with the services they received from the Defendants. Regardless of whether the client believed the result was satisfactory, the unauthorized practice of law is illegal in Massachusetts and the giving of legal advice by a nonattorney is prohibited by § 110(e)(2).  Patton, 1999 WL 431095 at *9.[52]

The unauthorized practice of law by a nonattorney bankruptcy petition preparer constitutes a fraudulent, unfair, or deceptive practice within the meaning of § 110(i)(1).[53] That unauthorized legal practice is made even more misleading when the petition preparer tells the client that he or she is not an attorney and cannot give legal advice, but then proceeds to do just that.  Moore v. Jencks, 232 B.R. at 9-10 (a bankruptcy petition preparer's "practices are all the more misleading if, while dispensing advice that had profound consequences for [the debtor], he assured her that none of it was 'legal advice'"); see also Tomlinson, 343 B.R. at 408; Evans, 413 B.R. at 327.  In a strikingly similar situation to the one here, another bankruptcy court described how profoundly misleading this juxtaposition can be:

---

[51] See also Briones-Coroy, 481 B.R. at 723 (bankruptcy petition preparer telling clients he is not an attorney and cannot provide legal advice "does not negate the fact that he is actually providing, directly and indirectly, legal advice to his customers"); Jay, 446 B.R at 252-53 (petition preparer's assertion that she tells customers that she does not practice law is immaterial to whether or not she has); Gomez, 259 B.R. at 386 (disclosure that petition preparer is not an attorney and cannot give legal advice does not protect preparer from sanctions under § 110).

[52] Frankly, without the independent advice of an attorney, the client is unable to gauge whether the result could have been more beneficial had proper legal services been rendered.

[53] See, e.g., Briones-Coroy, 481 B.R. at 738;   Sanchez, 446 B.R. at 551; Jay, 446 B.R. at 242; Kuhns v. U.S. Trustee, 2010 WL 1990558, *3 (N.D.W.V. May 18, 2010); Bagley, 433 B.R. at 334; Evans, 413 B.R. at 327; Rojero, 399 B.R. at 921; Mayton, 379 B.R at 607; Springs, 358 B.R. at 246; Tomlinson, 343 B.R. at 407; Waldschmidt v. Finch (In re Finch), 2004 WL 2272152, *16 (Bankr. M.D. Tenn. Oct. 6, 2004); Dunkle, 272 B.R. at 456; Moffett, 263 B.R. at 813.

[B]y using a patchwork of legal resources, reference to years of legal experience and a computer program, the[ bankruptcy petition preparers] embellish the illusion that prospective debtors receive the essential legal assistance necessary to obtain bankruptcy relief. This makes the disclosure to [the client] that [the petition preparer] is not an attorney and cannot provide legal advice particularly deceptive and misleading. The [petition preparers] simultaneously dispense advice which has potentially profound consequences while attempting to disclaim any responsibility for the advice given.

Gomez, 259 B.R. at 387. "So what *does* § 110 tacitly permit? The answer in a

nutshell is 'not much'":

Section 110 itself proscribes virtually all conduct falling into the category of guidance or advice, effectively restricting "petition preparers" to rendering only "scrivening/typing" services.   Anything else—be it suggesting bankruptcy as an available remedy for a debtor's financial problems, merely explaining how to fill out the schedules, or answering questions about exemptions or whether a claim is or is not secured will invariably contravene either state laws proscribing the unauthorized practice of law or other more specific provisions of § 110. The only service that a bankruptcy petition preparer can safely offer and complete on behalf of a *pro se* debtor after the enactment of § 110 is the "transcription" of dictated or handwritten notes prepared by the debtor prior to the debtor having sought out the petition preparer's service.   Any other service provided on behalf of the debtor by a non-attorney (even telling the debtor where the information goes on the form) is *not* permitted under state unauthorized practice of law statutes, and so is also not authorized by § 110.

Guttierez, 248 B.R. at 297-98.[54]

Apart from transcribing the information provided by debtors in exactly the form

presented and precisely where the debtor indicates, petition preparers can provide

some limited "secretarial-type services."   Landry, 268 B.R. at 305.   They can provide

------

[54] See also Briones-Coroy, 481 B.R. at 737 Kuhns v. U.S. Trustee, 2010 WL 1990558, *3 (N.D. W.Va. May 18, 2010); Payne, 414 B.R. at 114; Rojero, 399 B.R. at 920; Bernales, 345 B.R. at 216; Rose, 314 B.R. at 712; Gilliam Moore, 283 B.R. at 859; Moffett, 263 B.R. at 812, 814, 815; Gomez, 259 B.R. at 385; Bradshaw, 233 B.R. at 326; Kaitangian, 218 B.R. at 113 ; Hobbs, 213 B.R. at 218; Hartman, 208 B.R. at 780. Lyvers, 179 B.R. at 841; In re Burdick, 191 B.R. 529, 537 (Bankr. N.D.N.Y. 1996)

copies of the forms and limited information (such as court locations and filing fees), compile papers in the proper order, make copies of documents, and (with the limitations to be discussed later), provide mailing services.  In re Alexander, 284 B.R. 626, 635 (Bankr. N.D. Ohio 2002).[55]  A petition preparer can also provide translation services to debtors, including translating (without summarizing or explaining) court documents. See, e.g Wynns v. Adams, 426 B.R. 457, 464 (E.D.N.Y. 2010), aff'd Wynns v. Davis, 435 Fed. Appx. 27 (2d Cir. 2011) (petition preparer may convey factual information to client exactly as it appeared in a notice from the court).

Here, even if the Defendants' claims that they followed their described method of petition preparation in each case are to be believed, the practices they describe as comprising the "Pinnacle System" include the unabashed provision of legal advice and constitute the unauthorized practice of law.  Not only are bankruptcy clients provided with written and internet materials constituting legal advice, but those materials are also summarized and discussed to assist clients in determining what to include on the various bankruptcy schedules and statements.   And, "[t]o make matters more dangerous, [the Defendants] have done so without any real apprehension that what they are doing is the unauthorized practice of law.  To the contrary, they appear to be quite proud of their 'innovative' business model and strenuously argue that they are one of the 'legitimate' bankruptcy petition preparers in the marketplace."  Bernales, 345 B.R. at 211.

A fine of not more than $500 may be imposed for violations of § 110(e)(2).  See

---

[55] See also Evans, 413 B.R. at 328-29; Steward, 312 B.R. at 175.

11 U.S.C. § 110(l)(1).[56]  The unauthorized practice of law requires the disgorgement of all fees received by the bankruptcy petition preparer, because no compensation can be lawfully awarded for such activities.    See Moore, 2012 WL 2012 WL 4659873 at *14; Rojero, 399 B.R. at 919; Moffett, 263 B.R. at 817; Guttierez, 248 B.R. at 298 n. 31. Furthermore, § 110(i)(1) *requires* the Court to award sanctions to the debtor where it finds that a petition preparer has engaged in the unauthorized practice of law, as that practice constitutes an unfair and deceptive act.  11 U.S.C. § 110(i)(1); Sanchez, 446 B.R. at 540; Bowyer, 2013 WL 1141545 at *14; Rojero, 399 B.R. at 921.[57]

1.    Analysis

The "Pinnacle System" itself, as described by the Defendants, constitutes the unauthorized practice of law.  By providing the Bankruptcy Manual, Exemption Chart,

---

[56] Fines assessed pursuant to § 110(l)(1) "shall be paid to the United States trustees, who shall deposit an amount equal to such fines in the United States Trustee Fund."   11 U.S.C. § 110(l)(4)(A).

[57] Section 110(i)(1) provides:

(1)    If a bankruptcy petition preparer violates this section or commits any act that the court finds to be fraudulent, unfair, or deceptive . . . the court shall order the bankruptcy petition preparer to pay to the debtor --

(A)    the debtor's actual damages;

(B)    the greater of –

(i)    $2,000; or

(ii)    twice the amount paid by the debtor to the bankruptcy petition preparer for the preparer's services; and

(C)    reasonable attorneys' fees and costs in moving for damages under this subsection.

11 U.S.C. § 110(i)(1).  None of the debtors in these cases have presented evidence of actual damages, nor are there any attorneys' fees and costs incurred by the debtors in moving for damages.  Accordingly, where § 110(i)(1) applies, the Court has calculated sanctions solely under subsection (B).

and direction to specific websites, and by then discussing the information presented in those materials, Burton provides each debtor with legal advice and engages in the unauthorized practice of law.

### a.  *Lacroix*

Burton provided legal advice to the Lacroixs and engaged in the unauthorized practice of law by suggesting that the Lacroixs file a Chapter 7 case, by using financial information elicited from the Lacroixs to complete their petition, and by drafting both the motion to amend and the motion to vacate on the Lacroixs' behalf.

The Court will assess a fine of $500 on account of the Defendants' violations of §110(e)(2) by giving legal advice in connection with the petition preparation.  The Court will also assess fines of $500 each for violating § 110(e)(2) by advising the Lacroixs to file, and then drafting on their behalf, the motion to amend and the motion to vacate dismissal.  The Court will order the disgorgement of the $750 fee the Lacroixs paid the Defendants for petition preparation.   And because the unauthorized practice of law constitutes a deceptive and misleading act, the Court is required to assess sanctions under § 110(i)(1), which sanctions total, under subsection (B),  $2,000.

### b.  *Moya*

The Defendants violated § 110(e)(2) and engaged in the unauthorized practice of law by completing, in whole or in part, Moya's petition without his assistance, and (as Defendants assert) providing Moya with written materials and directing him to websites, and then discussing the information with Moya in order to assist him with the petition preparation.  The Defendants also engaged in the unauthorized practice of law by choosing Moya's exemptions, listing the appropriate statutory citations on Schedule C,

73

telling Moya that he would have to "qualify" to file a Chapter 7, and informing him, upon completion of the means test, that he did so "qualify."  See Bernales 345 B.R. at 223-24. Furthermore, the Defendants engaged in the unauthorized practice of law and provided Moya with legal advice when Burton drafted the motion to amend Moya's petition and prepared an affidavit on Moya's behalf.

Accordingly, the Court will assess fines totaling $1,500 for violations of § 110(e)(2): $500 for violations in connection with the petition preparation, $500 for drafting the motion to amend, and $500 for drafting the affidavit.  Since the Court has found that Moya was charged a $1,500 fee for the bankruptcy petition preparation, the Defendants will be ordered to disgorge that amount.  In addition, a sanction pursuant to 110(i)(1)(B) will be assessed in the amount of $3,000.

c.  *Morin*

The Defendants engaged in the unauthorized practice of law and provided legal advice by suggesting that Morin file a bankruptcy case under Chapter 13 and by completing the petition using previously-provided financial information, with no input from the debtor.  Accordingly, the Court will assess a fine of $500 for the violation of § 110(e)(2) in connection with the petition preparation, order disgorgement of the $500 fee, and assess sanctions in the amount of $2,000 pursuant to § 110(i)(1)(B).

d.  *Rosario*

Although the Court has made no finding regarding how the Rosarios' petition was prepared, under either the Rosarios' narrative or the Defendants' version, Burton would have engaged in the unauthorized practice of law and provided legal advice to the Rosarios.  The Defendants assert that the Rosarios were provided with the same written

and internet materials as other debtors, and that the petition was then prepared during meetings with Burton and at the Rosarios' direction. However, by giving the Rosarios specific legal materials to assist with the preparation of the petition, Burton would be engaging in the unauthorized practice of law.

Because the Defendants engaged in the unauthorized practice of law, they must disgorge all fees received from the Rosarios in connection with the bankruptcy petition preparation, which the Court finds to be $2,500.[58]   The Defendants will also be assessed a fine of $500 for the Defendants' violation of § 110(e)(2)'s prohibition against providing legal advice. Pursuant to § 110(i)(1), the Court is required to issue sanctions under that section, which sanctions are assessed under subsection (B) at $5,000.

e.   *Lopez*

By providing Lopez with written materials, directing her to websites, and then discussing that information with the debtor, the Defendants violated §110(e)(2) and engaged in the unauthorized practice of law. Accordingly, the Court will assess a fine of $500 for the violations of § 110(e) pursuant to § 110(l)(1), will order disgorgement of the

---

[58] There is no dispute that, on July 20, 2011, Elizabeth Rosario wrote a personal check in the amount of $2,500 payable to the Defendants shortly after the Rosarios decided to file the bankruptcy case. On the memo line of that check, Elizabeth wrote "Chapter 13 filing." Ex. 4A. Whether the entirety of those funds were paid on account of the petition preparation (as opposed to the attempted loan modification) was the subject of considerable dispute, made more complicated by the lack of credibility of both Pinnacle's representatives and the Rosarios. Nevertheless, this Court does accept two exhibits that were filed at trial as strong evidence of the truth. The first, an invoice dated July 20, 2011, shows $3,500 chargeable to Felix Rosario, for "chapter 13 bankruptcy petition preparation." Ex. 4 139. It further states: "client agrees to pay $2,500.00 due 7/20/11; Client agrees to pay $1,000 due 9/15/11; client agrees to pay $274 for filing fee due to Bankruptcy Court." Id. The second, a receipt, also dated July 20, indicates that $2,500 was received from Elizabeth for "Chpt 13-Balance Due 9/15/11"; the "balance due" is listed as $1,000. Ex. 4 141. As the Court is unable to credit much of the testimony on this particular issue, it must instead rely on the presented evidence – evidence which indicates that the fee paid by the Rosarios to the Defendants for the petition preparation was $2,500.

$750 paid to the Defendants for bankruptcy petition preparation services, and will sanction the Defendants in the amount of $2,000 pursuant to § 110(i)(1)(B).

### f.    *Javier*

By providing Javier with written materials, directing him to websites, and then discussing that information with the debtor, the Defendants violated §110(e)(2) and engaged in the unauthorized practice of law.  Accordingly, the Court will assess a fine of $500 for the violation of § 110(e)(2) and will order disgorgement of the $750 fee paid by Javier for the Defendants' petition preparation services.   In addition, the Court will sanction the Defendants in the amount of $2,000 pursuant to § 110(i)(1)(B).

### g.    *Morillo*

By providing Morillo with written materials, directing him to websites, and then discussing that information with the debtor, the Defendants violated §110(e)(2) and engaged in the unauthorized practice of law.  Burton also engaged in the unauthorized practice of law and gave legal advice to Morillo when he drafted a response to the Order to Update on Morillo's behalf.

Accordingly, the Court will assess a fine of $500 for the violations of § 110(e)(2) in connection with the petition preparation and an additional $500 for the legal advice given in preparing the response to the Order to Update.  The Court will further order the Defendants to disgorge the $750 fee paid by Morillo and will assess sanctions in the amount of $2,000 pursuant to § 110(i)(1)(B).

### C.    Section 110(g): Prohibition Against Collecting or Receiving Court Fees

Section 110(g) prohibits a bankruptcy petition preparer from "collecting" or "receiving" any payment from the debtor or on the debtor's behalf for the filing fee in a

bankruptcy case.[59]  The Defendants regularly accept bank checks or money orders for filing fees from debtors, although the checks are made payable to the bankruptcy court and are not deposited by the Defendants.  Every court to address this issue (with one exception) has held that § 110(g) prohibits this practice.[60]

> The plain language of the statute clearly prohibits it.  As one court explained:
>
> In choosing the words "collect or receive any payment" with respect to the petition filing fee, Congress has selected common terms in the disjunctive, designed to sweep broadly . . . .   The words collect and receive do not seem to have any particular legal definition, but an ordinary definition of receive includes the concepts of simply "tak[ing] possession or delivery of," "taking in: to act as a receptacle or container for" and "to come into possession of."   *Webster's Third New International Dictionary* 1894 (1986).   [The debtor's] money order was a payment for the filing fee for her petition, and in accepting it and controlling it on her behalf, [the bankruptcy petition preparer] clearly took possession and delivery of it within the plain meaning of § 110(g).

Alexander, 284 B.R. at 633; see also, Bonarrigo, 282 B.R. at 106-07.

In In re Reed, 208 B.R. 695 (Bankr. N.D. Cal. 1997), however, the court held that the petition preparer in that case did not violate 110(g) by accepting a money order payable to the bankruptcy court for the filing fee and delivering the fee to the court along

---

[59] Section 110(g) reads:

> A bankruptcy petition preparer shall not collect or receive any payment from the debtor on behalf of the debtor for the court fees in connection with filing the petition.

11 U.S.C. § 110(g).

[60] See, e.g., Steward, 312 B.R. at 180-81 ("[the] language is both broad and clear, and thus would preclude even an agency relationship whereby the BPP is a conduit or caretaker for a negotiable instrument that the debtor instructs the BPP to deliver to the bankruptcy court clerk.") (citations omitted); Scott v. Tighe (In re Buck), 307 B.R. 157, 163 (C.D. Cal. 2004); McDonald, 318 B.R. at 44; Finch, 2004 WL 2272152 at *11-12; Rose, 314 B.R. at 714-15; In re Paysour, 313 B.R. 109, 116-17 (Bankr. E.D.N.Y. 2004); Bonarrigo, 282 B.R. at 106-07; Doser, 281 B.R. at 312; U.S. Trustee v. Summerrain (In re Avery), 280 B.R. 523, 531 (Bankr. D. Colo. 2002); Moffett, 263 B.R. at 812; In re Jones, 227 B.R. 704, 705 (Bankr. S.D. Ind. 1998); Green, 197 B.R. at 879; In re Burdick, 191 B.R. 529, 535 (Bankr. N.D.N.Y. 1996).

with the petition.  In <u>Reed</u>, the court did not view this activity as "collecting or receiving" funds, characterizing the petition preparer as the debtor's "agent" in delivering the fee. <u>Id.</u> at 696.  But in support of this conclusion, the court emphasized a separate Code provision that referred to a petition preparer's delivery of other documents to the court on the debtor's behalf.  The <u>Reed</u> court reasoned that the delivery of the money order vested no more control over the timing of the filing than the delivery of the papers. <u>Id.</u> at 697.  The court found the consequence – that the filing fee and the petition would have to be filed separately – unreasonable. <u>Id.</u>

This Court respectfully disagrees with the court in <u>Reed</u> for the reasons amply articulated in subsequent cases.  First, a great deal of the reasoning in <u>Reed</u> was based on the reference to a petition preparer's delivery of a debtor's documents to the court as set forth in the former version of § 110; that language has since been deleted from the statute.  Second, this Court agrees with the observation made in <u>Buck</u>, where the court noted that the impracticality argument is based on:

> unstated and unsupported assumptions – ie., that Congress wanted petition preparers to assist debtors with the filing process or that the only way that a petition can be filed is if the preparer personally goes to the courthouse or personally arranges for a messenger service.  Nothing in section 110 even suggests that Congress intended petition preparers to be involved with the petition filing process *at all.*

307 B.R. at 161.  The <u>Buck</u> court aptly noted that, even if § 110(g) does create some practical limitations, the plain language of the statute remains harmonious with Congressional intent "to protect debtors from both unethical and inept petition preparers."  <u>Id.</u> at 162 (quoting <u>Heppner v. Alyeska Pipeline Serv. Co.</u>, 665 F.2d 868, 872 (9th Cir. 1981)).  Accordingly, the Court adopts the majority position that the plain language of § 110(g) does not produce an absurd result in light of the congressional

78

purpose underlying § 110.

The Defendants argue, however, that they simply receive fees as part of their "mailing service," or sometimes hand-deliver the fees to the court while delivering the petition. But, as just explained, that practice violates § 110(g). While it may be permissible for bankruptcy petition preparers to provide assistance to a debtor to ready the petition for mailing along with the filing fee (i.e., organizing the documents, addressing the envelope, and calculating postage), they cannot do what the Defendants here apparently do – accept the filing fee from the debtor and then assemble and mail the package themselves. If the petition needs to be hand delivered, the debtors are free to bring the filing fee directly to the court.

Because the Court has found that the Defendants received a bank check or money order from the debtors for the Court filing fees in each case (with the exception of the <u>Rosario</u> case[61]), fines in the amount of $100 will be assessed in each of those cases for the violation of § 110(g). Although the Court has the discretion, under § 110(l)(1) to impose a greater fine, the Court chooses to impose this lesser fine in each case in light of the existence of the <u>Reed</u> decision (notwithstanding that the case law is virtually unanimous to the contrary). However, Burton, as a law school graduate who claimed to have researched the interpretation and application of § 110 provisions, should have known that Pinnacle's practice violated the statute.

---

[61] The Court was ultimately unable to determine the circumstances surrounding the payment of the filing fee for the <u>Rosario</u> case. The Rosarios steadfastly maintained that they gave Burton cash for the filing fee, while the Court has on record a money order for the filing fee signed by Elizabeth Rosario. The Court finds that the Trustee has not established that Pinnacle employees "collected" or "received" the Rosarios' fee.

### D.    Section 110(d): Requirement to Provide a Copy of Documents for Filing at Time of Signing

Section 110(d) provides that a bankruptcy petition preparer "shall, not later than the time at which a document for filing is presented for the debtor's signature, furnish to the debtor a copy of the document."  11 U.S.C. § 110(d); see also Avery, 280 B.R. at 530; Kaitangian, 218 B.R. at 116; Hartman, 208 B.R. at 777; Walton v. Levinson (In re Schweitzer), 196 B.R. 620, 625 (Bankr. M.D. Fla. 1996); Burdick, 191 B.R. at 535. Given the clear admonition of § 110(d), the Court will assess a fine of $500 in each case where it was demonstrated that the debtors were not provided with copies of documents to be filed at the time of signing—namely, the Lacroix, Moya, and Morin cases.[62]

### E.    Section 110(h)(2): Requirement to Disclose Fees Received Within Twelve Months Preceding the Filing of the Case

The plain language of § 110(h)(2) requires a bankruptcy petition preparer to disclose all fees received from the debtor (or on the debtor's behalf) within 1 year prior to the petition date (as well as any unpaid fee at the time of filing).[63]  The statute does not limit that disclosure to only those fees received in connection with the bankruptcy petition preparation; it requires disclosure of *all fees* received, for whatever purpose. See Briones-Coroy, 481 B.R. at 712; Evans, 413 B.R. at 324; In re Moran, 256 B.R.

---

[62] While Court could assess a $500 fine for the Defendant's failure to provide a copy of each separate "document for filing," see 11 U.S.C. § 110(a)(2), the Court will instead assess only a $500 total fine for the Defendants' § 110(d) violations in each case.

[63] Specifically, § 110(h)(2) provides:

A declaration under penalty of perjury by the bankruptcy petition preparer shall be filed together with the petition, disclosing any fee received from or on behalf of the debtor within 12 months immediately prior to the filing of the case, and any unpaid fee charged to the debtor. . . .

11 U.S.C. § 110(h)(2).

842, 852 (Bankr. D.N.H. 2000); <u>Kaitangian</u>, 218 B.R. at 114.  As the Trustee correctly notes, the Defendants violated this requirement in the <u>Rosario</u>, <u>Moya</u>, and <u>Morin</u> cases.

The Court declines to assess a fine under § 110(l)(1) for the violations, however. Official Form 280, the form by which a petition preparer discloses fees as required by §110(h)(2), instructs the preparer to disclose only the "compensation paid to [the bankruptcy petition preparer] within one year before the filing of the bankruptcy petition, or agreed to be paid [to the petition preparer], *for services rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case.*"  Official Form 280 (emphasis supplied).

This language mirrors that used in Official Form 203, the form used by debtors' *attorneys* to disclose their compensation.  The disclosure requirements for a debtor's attorney, however, are governed by § 329(a), which limits the disclosure to compensation paid or agreed to be paid within one year prior to the petition date "for services rendered or to be rendered in contemplation of or in connection with the case." 11 U.S.C. § 329(a).  But § 110(h)(2) does *not* so limit the disclosure required by bankruptcy petition preparers, and the Court finds the form to be in conflict with the statute.  Bankruptcy forms "must yield to [the Bankruptcy Code] in the event of conflict," <u>Schwab v. Reilly</u>, -- U.S.--, 130 S.Ct. 2652, 2660 fn. 5 (2010).  Thus, while the Court will not impose fines for the violations of § 110(h)(2) in these cases, the Court will expect and require – in all cases filed after the entry of this Memorandum of Decision – full disclosure of all fees received by a bankruptcy petition preparer in the 12 months preceding the case filing, whether or not those fees are related to the petition preparation.

**F.      Section   110(b)(1)   and   (c):   Identification   and   Declaration
         Requirements**

Sections 110(b)(1) and (c) set forth detailed requirements regarding disclosures
that must accompany *each* "document for filing," defined as "a petition or any other
document prepared for filing by a debtor . . . in connection with a case under this title."
11 U.S.C. § 110 (a)(2).   The bankruptcy petition preparer must sign each document
prepared for filing, disclose the preparer's name and address, and include the
preparer's social security number after the signature.  11 U.S.C. §§ 110(b)(1), (c).[64]  If a
petition preparer is not an individual, then in addition to disclosing the name and

---

[64]  Specifically, those sections provide:

> (b)    (1)    A bankruptcy petition preparer who prepares a document for filing
>               shall sign the document and print on the document the preparer's
>               name and address. If a bankruptcy petition preparer is not an
>               individual, then an officer, principal, responsible person, or partner
>               of the bankruptcy petition preparer shall be required to—
>
>         (A)    sign the document for filing; and
>
>         (B)    print on the document the name and address of that
>               officer, principal, responsible person, or partner.
>
> . . .
>
> (c)    (1)    A bankruptcy petition preparer who prepares a document for filing
>               shall place on the document, after the preparer's signature, an
>               identifying number that identifies individuals who prepared the
>               document.
>        (2)    (A)    Subject to subparagraph (B), for purposes of this section,
>               the identifying number of a bankruptcy petition preparer
>               shall be the Social Security account number of each
>               individual who prepared the document or assisted in its
>               preparation.
>        (B)    If a bankruptcy petition preparer is not an individual, the
>               identifying number of the bankruptcy petition preparer shall
>               be the Social Security account number of the officer,
>               principal, responsible person, or partner of the bankruptcy
>               petition preparer.

11 U.S.C. § 110(b)(1), (c).

address of the individual who actually prepared the document, the name and address of the corporate petition preparer must be disclosed, and "an officer, principal, responsible person, or partner" of the corporation must sign the document, and include his or her name, address, and social security number. 11 U.S.C. § 110(b)(1), (c);  see also Avery, 280 B.R. at 529; Gomez, 259 B.R. at 384.

Here, Burton is both the individual who actually prepared the documents and a principal of Pinnacle; no other individual would have been required to sign the documents.[65]  Pinnacle's role as a petition preparer is not clearly identified in the declarations, nor is Burton's role as both preparer and company principal easily discerned.  A more complete disclosure for purposes of § 110(b)(1) and (c) should specifically identify the company by name and address and the individual as both petition preparer and principal of the company, with that individual's name, address, and social security number.

The Defendants failed to comply with § 110(c) in some instances by not disclosing Burton's full social security number with each required signature.  The explanation for this particular failure, however, *does* appear credible – namely, that Burton was informed that his full social security number was not required.  While Burton's full social security number is not disclosed in the earlier-filed cases, the documents in the later-filed cases *do* contain the complete number.  While the Court will decline to impose fines for failure to disclose the complete number in the earlier cases, the Court agrees with other courts that the inclusion of the full social security number is

---

[65] However, to the extent that Pinnacle employees other than Burton assist in the actual preparation of any document (other than simply providing translation services), their signatures would also be required in addition to Burton's.

required.  See, e.g., Baugh, 416 B.R. at 909; Carrier, 363 B.R. at 255.

But the Defendants have failed to comply with §§ 110(b)(1) and (c) in more substantial ways.  First, the Defendants did not appropriately identify themselves on *each* document for filing.  Official Form 19 was drafted to standardize the declaration and identification requirements of §§ 110(b)(1) and (c).  Form 19 includes a declaration statement (indicating that the petition preparer prepared the accompanying document) along with spaces for the signature, address, and identifying number of the petition preparer.  "[A]daptations of this form have been incorporated into . . . the voluntary petition, the schedules, the statement of financial affairs, and other official forms that typically would be prepared for a debtor by a bankruptcy petition preparer."  1995 Committee Note.  For those documents, the disclosure and identification requirements are satisfied by the completion of the declaration section at the end of the document.  The Defendants *did* consistently complete the declaration sections on those documents that incorporate Form 19 requirements into the document itself.

Other documents, however, do not contain a declaration section in the document itself.  In such cases, Form 19 was originally intended to be completed and filed separately for *each* document.  See 1995 Committee Notes.[66]  Form 19 was amended in 2007, however, to permit a petition preparer to comply with the §§ 110(b)(1) and (c) disclosure and identification requirements with regard to "multiple documents prepared for a single filing," 2005-2007 Committee Note, without having to separately complete

---

[66] Apparently, petition preparers frequently fail to include the appropriate declaration with regard to those documents that do not contain the declaration at the end of the document itself.  See, e.g., Briones-Coroy, 481 B.R. at 714; Bagley, 433 B.R. at 333; Hartman, 208 B.R. at 777; Moore, 2012 WL 4659873 at *8; Carrier, 363 B.R. at 250-51, 255; Springs, 345 B.R. at 242; Hobbs, 213 B.R. at 212.

and file Form 19 with each individual document.  The amended Form 19 still contains a declaration statement as well as spaces for the signature, address, and identification number of the petition preparer.  But it now also contains a section for the petition preparer to list multiple documents prepared for filing.[67]  Thus, when multiple documents are filed at one time, the preparer can comply with the disclosure and identification requirements by signing and identifying him or herself on just one Form 19 and listing there all the prepared documents.

This is not what the Defendants did in each of these cases, however.  While the Defendants filed Official Form 19 with the petition, in none of the cases did the Defendants list on the form any "accompanying documents."  Accordingly, for those documents that do not include a declaration section at the end of the document, the Defendants failed to appropriately comply with requirements of §§ 110(b)(1) and (c).

The Defendants also failed, on numerous occasions, to comply with §§ 110(b)(1) and (c) in relation to documents filed postpetition.  Some of those failures, such as failing to disclose the preparation of the certification of completion of the financial management courses, may not seem particularly egregious.  What *is* disturbing, however, are the several instances where the debtors filed motions or responses drafted by Burton, but neither Burton or Pinnacle are identified as having prepared those documents. See Jay, 446 B.R. at 240; Carrier, 363 B.R. at 251, 255.

Pursuant to § 110(l)(1), the Court may assess a fine of up to $500 for each failure

---

[67] Official Form 19 also now "contains the notice a bankruptcy petition preparer is required to give to a debtor under § 110 of the Code . . . and the bankruptcy petition preparer's signed declaration . . . that the notice was given to the debtor." Id.  That notice will be discussed later in this memorandum.

to comply with §§ 110(b)(1) or (c). And § 110(l)(2)(D) *requires* the Court to triple that fine if a document was prepared in a manner that failed to disclose that the petition preparer prepared the document for the debtor. 11 U.S.C. § 110(l)(2)(D); <u>see also</u> <u>Amezcua</u>, 2013 WL 272809 at *4, 6; <u>Johnson</u>, 2012 WL 5193964 at *8. In those instances where the Defendants violated §§ 110(b)(1) and (c) by failing to list certain petition documents on Form 19, tripling of the fines is not warranted. In each case, although not listed on Official Form 19, the Defendants did acknowledge their preparation of the documents on the Disclosure of Compensation forms; they did not completely fail to disclose that they had prepared the documents. With regard to the postpetition filings, however, especially the motions and responses filed on behalf of several of the debtors, there was a complete lack of any disclosure that the Defendants had prepared the documents. In those cases, the Court is required by § 110(l)(2)(D) to triple the fines.

          1.    <u>Lacroix</u>

The Defendants violated §§ 110(b)(1) and (c) by failing to appropriately identify themselves with regard to the preparation of the statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, means test form, statement of social security number, and statement of intention. The Court will assess a total fine of $500 for these violations.

The Defendants also violated §§ 110(b)(1) and (c) by failing to identify themselves on both the motion to amend schedules and the motion to vacate the dismissal. The Court will assess the maximum fine of $500 for each violation of § 110(b)(1) and each violation of § 110(c) – a total of $2,000. Because those

documents were prepared in a manner that failed to disclose the Defendants' role in preparing the documents, § 110(l)(2)(D) requires the Court to triple that fine, for a total fine of $6,000.

### 2.  Moya

The Defendants violated §§ 110(b)(1) and (c) by failing to appropriately identify themselves with regard to the preparation of the statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, means test form, statement of intention, statement of social security number, and certificate of completion of the financial management course.  Pursuant to § 110(l)(1), the Court will assess a total fine of $500 for these violations.

The Court will also assess a fine of $500 for each failure to comply with § 110(b)(1) and (c) with regard to the preparation of the motion to amend the petition. Because that document did not disclose the Defendants' role in its preparation, those fines must be tripled pursuant to § 110(l)(2)(D), for a total assessed fine of $3,000.[68]

### 3.  Morin

The Defendants violated §§ 110(b)(1) and (c) by failing to appropriately identify themselves with regard to the preparation of the statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, statement of social security number, and means test form.  Pursuant to § 110(l)(1), the Court will assess a total fine of $500 for these violations.

### 4.  Rosario

---

[68] The Defendants also drafted the affidavit on Moya's behalf without disclosing that they had drafted that document.  However, although that action constitutes the unauthorized practice of law, it did not violate §§ 110(b)(1) and (c) because it was not filed with the Court.

The Defendants violated §§ 110(b)(1) and (c) by failing to appropriately identify themselves with regard to the preparation of the statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, statement of social security number, and means test form.  Pursuant to § 110(l)(1), the Court will assess a total fine of $500 for these violations.  Although Burton did not include his full social security number on the documents, the Court will not, at this time, assess any fine for that failure.  However, any future violations of § 110(c) will result in the maximum fine provided under § 110(l)(1).

     5.   <u>Lopez</u>

The Defendants violated §§ 110(b)(1) and (c) by failing to appropriately identify themselves with regard to the preparation of the statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, means test form, statement of intention, statement of social security number, and certificate of completion of the financial management course.  Pursuant to § 110(l)(1), the Court will assess a total fine of $500 for these violations.  Although Burton did not include his full social security number on the documents, the Court will not, at this time, assess any fine for that failure.

     6.   <u>Javier</u>

The Defendants violated §§ 110(b)(1) and (c) by failing to appropriately identify themselves with regard to the preparation of the statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, statement of social security number, and means test form.  Pursuant to § 110(l)(1), the Court will assess a total fine of $500 for these violations.

7.   Morillo

The Defendants violated §§ 110(b)(1) and (c) by failing to appropriately identify themselves with regard to the preparation of the statement of compliance with the credit counseling requirement, creditor matrix, verification of creditor matrix, means test form, statement of social security number, and certification of completion of the financial management course.  Pursuant to § 110(l)(1), the Court will assess a total fine of $500 for those violations.

The Defendants further violated §§ 110(b)(1) and (c) by failing to identify themselves on the response to the order to update.  The Court will assess a $500 fine for each violation of §§ 110(b)(1) and (c), which must be tripled pursuant to § 110(l)(2)(D), for a total of $3,000.

## G.   Section 110(b)(2): Requirement to Provide Prescribed Notice before Preparing Documents or Accepting Fees

In addition to the petition preparer certifications required by § 110(b)(1), subsection (b)(2) further provides:

> Before preparing any document for filing or accepting any fees from or on behalf of a debtor, the bankruptcy petition preparer shall provide to the debtor a written notice which shall be on an official form prescribed by the Judicial Conference of the United States in accordance with rule 9009 of the Federal Rules of Bankruptcy Procedure.

11 U.S.C. § 110(b)(2)(A).  The required notice, which is found on the second page of Official Form 19,[69] must be given to the client *before* the petition preparer accepts any

---

[69] Specifically, the notice:

(i)     shall inform the debtor in simple language that a bankruptcy petition preparer is not an attorney and may not practice law or give legal advice;

(ii)    may contain a description of examples of legal advice that a bankruptcy

fee or prepares a document for filing.  See id.; Evans, 413 B.R. at 323; Mayton, 379

B.R. at 606; Springs, 358 B.R. at 243; Bernales, 345 B.R. at 226.

In each of the cases before the Court there was no evidence that any of the

debtors received the required notice prior to the Defendants' accepting the fee or

beginning preparation of the documents.  Instead, the notices are each signed and

dated with the completed documents, i.e., after the completion of the petition and the

debtors' payment of fees to the Defendants. Pursuant to § 110(l)(1), the Court will

assess a fine of $500 in each case for failure to comply with § 110(b)(2).

### H.    Section 110(f): Prohibition on the Use of the Word "Legal" or Any Similar Term in Advertising

Section 110(f) prohibits a bankruptcy petition preparer from "us[ing] the word

'legal' or any similar term in any advertisements." 11 U.S.C. § 110(f).[70]  The purpose of

§ 110(f) is to:

> ensure that debtors understand exactly what they will and will not receive
> from bankruptcy petition preparers.  Petition preparer advertising must
> keep well clear of any suggestion that the preparer will be offering legal
> services or insights.

---

> petition preparer is not authorized to give, in addition to any advice that
> the preparer may not give by reason of subsection (e)(2); and
>
> (iii)    shall—
>
>     (I)    be signed by the debtor and, under penalty of perjury, by the
>            bankruptcy petition preparer; and
>
>     (II)   be filed with any document for filing.

11 U.S.C. § 110(b)(2)(B).

[70] Section 110(f) further prohibits bankruptcy petition preparers from advertising under any
category that uses the word "legal" or a similar term.  11 U.S.C. § 110(f).  The Trustee has not
alleged, nor is there any evidence before the Court, that the Defendants violated that specific
prohibition.

Hobbs, 213 B.R. at 215; see also McDonald, 318 B.R. at 45; Gomez, 259 B.R. at 385.

As the language of the statute makes clear, the restriction is not confined solely to the

use of the word "legal"; instead, "[m]ost courts addressing this issue have found that

§ 110(f) is violated by *any advertising that gives the impression that a petition preparer*

*is providing legal services.*"  In re Delgado, 04-03283-C, 2005 WL 758809 (Bankr. N.D.

Iowa April 1, 2005) (emphasis supplied).

Thus, the use of the word "paralegal" has been found to violate § 110(f) not only

because it actually contains the prohibited word "legal," but also because it "promotes

[the petition preparer's] 'legal skills.'" Hobbs, 213 B.R. at 215.  Promotion of a petition

preparer's legal skills "leads a reasonable lay person to believe that [the petition

preparer] offers the public legal services, legal advice or legal assistance regarding

Bankruptcy,"    In re Bachmann, 113 B.R. 769, 774 (Bankr. S.D. Fla. 1990), which

bankruptcy petition preparers are not authorized to provide.  See Moffett, 263 B.R. at

813; Gomez, 259 B.R. at 385-87; Hobbs, 213 B.R. at 215; Bachmann, 113 B.R. at 774.

For this reason, other courts have held that  a bankruptcy petition preparer's reference

to the preparer's law school degree or having a "juris doctorate" in connection with

advertising petition preparation services violates § 110(f).  See Mayton, 379 B.R. at 606;

The Florida Bar v. Catarcio, 709 So.2d 96, 100 (Fla. 1998).

Here, the Defendants emphasize Burton's legal education on the Pinnacle

website and Burton identifies himself on both the website and his business cards as

possessing a "juris doctorate."  This "fosters consumer confusion," Hobbs, 213 B.R. at

215, and "could mislead the public into believing [the Defendants] can assist the public

in legal matters," Catarcio, 709 So.2d at 100, as evidenced by Burton's admission that

clients often come to Pinnacle's offices believing he is a licensed attorney. Contrary to the Defendants' assertion, Burton's legal education and experience should *not* be relevant to the consumer's decision to hire the Defendants for bankruptcy petition preparation services. Burton's legal qualifications "do not expand the scope of services" the Defendants can legally provide. <u>Gomez</u>, 250 B.R. at 386. Instead, by advertising his legal education and experience in connection with the Defendants' petition preparation business, the Defendants give the misleading, and prohibited, impression that the client will receive "the benefit of legal expertise, knowledge and skill which [the Defendants are] neither licensed . . . nor authorized by § 110 to provide." <u>Id.</u> at 387.

Accordingly, the Court finds that the Defendants' references to Burton's legal education and experience in connection with advertising their petition preparation services, especially the use of the suffix "J.D." in identifying Burton on his business cards and the Pinnacle website, violates § 110(f).[71] Pursuant to § 110(l)(1), the Court will assess a fine of $500 for this violation.

I.      **Sections 527 and 528: Notices and other Requirements for Debt Relief Agencies**

In addition to the specific provisions governing bankruptcy petition preparers set forth in § 110, petition preparers are also "debt relief agencies" under the Bankruptcy Code, pursuant to § 101(12A).[72] As such, petition preparers must also comply with the

---

[71] This conclusion was forewarned at the hearing held on March 29, 2011 in <u>In re Ortiz</u>, Chapter 7 Case No. 10-46195-HJB. The Defendants say that the Court requested Burton to stop using "J.D." after his name when signing bankruptcy documents. The Court has reviewed the audio recording of that hearing, and concludes that it was made clear to Burton that the Court's expressed concern was actually with regard to the use of "J.D." after Burton's name on the Pinnacle website.

[72] Section 101(12A) defines a "debt relief agency" as "any person who provides any bankruptcy

requirements of §§ 526-528.  <u>See</u> 11 U.S.C. §§ 526 ("Restrictions on debt relief agencies"); 527 ("Disclosures"); 528 ("Requirements for debt relief agencies").

Section 527 details several disclosures that a debt relief agency must provide to prospective debtors.  With the exception of the notice requirements found in § 342(b)(1) (incorporated into the notice requirements of § 527 pursuant to subsection (a)(1)), the Defendants produced no evidence that any of the debtors in these cases received the other disclosures required by § 527, despite the requirement in subsection (d) that a copy of the notice be maintained for 2 years after the date it is provided to the client. <u>See</u> 11 U.S.C. § 527(b), (d).[73]

The Defendants also failed to comply with the requirements for debt relief agencies set forth in § 528.  Section 528(a) requires a debt relief agency to execute a written contract with a client within 5 days after bankruptcy services are first provided, which contract must "clearly and conspicuously" explain the services that will be provided, the fees charged, and terms of payment.  11 U.S.C. § 528(a).  Here, in several cases, the Defendants failed to produce any fee agreement.

Sections 528(a)(4) and (b)(2) further require that, in conjunction with any advertisement of a debt relief agency's bankruptcy assistance services, the following

---

assistance to an assisted person in return for the payment of money or other valuable consideration, or *who is a bankruptcy petition preparer under section 110.*"  11 U.S.C. § 101(12A) (emphasis supplied).

[73] The Defendants would not be required to comply with § 527(c).  As the court in <u>Bernales</u>, 345 B.R. at 217-18, noted, the specific provisions of § 527(c) impose a duty on debt relief agencies to provide debtors with specific information on how to comply with § 521, but only "to the extent permitted by nonbankruptcy law."  11 U.S.C. § 527(c).  Because such information would constitute the giving of legal advice, in contravention of nonbankruptcy laws prohibiting the unauthorized practice of law, a nonattorney petition preparer would not need to demonstrate compliance with that subsection.

statement must be included: "We are a debt relief agency.  We help people file for bankruptcy relief under the Bankruptcy Code." 11 U.S.C. § 528(a)(4), (b)(2).[74]  Despite the fact that Pinnacle's website advertises its bankruptcy petition preparation services, the statement is not included in that advertising.

Violations of these provisions may warrant an assessment of damages or an order requiring the debt relief agency to return all fees charged for bankruptcy assistance.  11 U.S.C. § 526(c)(2).  In addition, the Court may enjoin further violations or impose an appropriate civil penalty for such violations if the Court finds that the violation was intentional or part of a "clear and consistent pattern or practice."  11 U.S.C. § 526(c)(5).  Accordingly, the Court finds that the Defendants' consistent violations of §§ 527 and 528 further warrant the disgorgement of all fees paid by the debtors in these cases.  And the Court has considered the Defendants' consistent failure to comply with §§ 527 and 528 in determining the appropriate scope of the injunction that will issue against the Defendants.

**J.    Reasonable Fees**

"The court shall disallow and order the immediate turnover to the bankruptcy trustee any fee . . . found to be in excess of the value of any services rendered by the bankruptcy petition preparer . . . ." 11 U.S.C. § 110(h)(3)(A).  The burden of proving the reasonableness of a bankruptcy petition preparer's fee rests on the petition preparer. Springs, 358 B.R. at 242; see also Evans, 413 B.R. at 329.

"When determining whether a fee is excessive, courts inquire whether the value and quality of the services provided by the preparer corresponds with the amount paid

---

[74] The statute also allows the use of a "substantially similar statement."  11 U.S.C.  § 528(a)(4), (b)(2).

by the debtor." <u>Hartman</u>, 208 B.R. at 780.   And, in evaluating the value of those services, the court does not generally consider claims that "enhanced services" were provided.   Rather, "the starting point for most courts has been evaluating what services a petition preparer is legally permitted to provide, and then establishing the value of those services." <u>Alexander</u>, 284 B.R. at 635; <u>see also</u> <u>Kuhns</u>, 2010 WL 1990558 at *3; <u>Doser</u>, 281 B.R. at 314-15.   In addition, an excessive charge for bankruptcy petition preparation services may also be deceptive and misleading, because it creates the impression that debtors are receiving services in excess of what is allowed under § 110. <u>Gilliam Moore</u>, 283 B.R. at 859.

Courts have generally allowed compensation for bankruptcy petition preparers on par with the compensation received by those who provide typing or secretarial services. The fees charged by the Defendants far exceed those allowed in other cases.[75]   In general, courts have allowed fees at rates from $20 to $50 per hour (with 2-10 hours being a reasonable time to prepare a petition) and flat fees ranging from $50 to $150.

The Court need not determine in the context of these cases, however, what a reasonable fee (whether an hourly rate or a flat fee) would be in today's marketplace.

---

[75] <u>See, e.g.</u>, <u>Kuhns</u>, 2010 WL 1990558 at *3 ($50 per hour or $150 total); <u>Payne</u>, 414 B.R. at 113 ($25 per hour or $125 total); <u>Evans</u>, 413 B.R. at 329 ($160); <u>Rojero</u>, 399 B.R. at 920 ($170 fee); <u>Carrier</u>, 363 B.R. at 252, 257 ($112.50 flat fee); <u>Howerton</u>, 2004 WL 2757908 at *5 ($80 flat fee); <u>McDonald</u>, 318 B.R. at 47 ($50 per hour or $150 total); <u>Rose</u>, 314 B.R. at 713 ($50 typing and $10 copying fee); <u>Alexander</u>, 284 B.R. at 637 ($200 flat fee); <u>Gilliam Moore</u>, 283 B.R. at 859 ($80 fee); <u>Bonarrigo</u>, 282 B.R. at 107 ($20 per hour); <u>Doser</u>, 281 B.R. at 318 ($30 per hour); <u>In re Schneider</u>, 271 B.R. 761, 765 (Bankr. D. Vt. 2002) ($30 per hour); <u>Landry</u>, 268 B.R. at 308 ($75 per hour or $112.50 total fee); <u>Moffett</u>, 263 B.R. at 816 ($20 per hour or $100 total fee); <u>In re Pavlis</u>, 264 B.R. 57, 59 (Bankr. D.R.I. 2001) ($30 per hour or $150 total fee); <u>Moran</u>, 256 B.R. at 850-51 ($30 per hour or $150 total fee); <u>Guttierez</u>, 248 B.R. at 298 ($50 flat fee); <u>In re Wagner</u>, 241 B.R. 112, 122 (Bankr. E.D. Pa. 1999) ($50 flat fee); <u>Bradshaw</u>, 233 B.R. at 327 ($50 flat fee); <u>Moore v. Jencks</u>, 232 B.R. at 13 & n.21 ($75 flat fee); <u>Agyekum</u>, 225 B.R. at 699 ($125 flat fee); <u>Hartman</u>, 208 B.R. at 780 ($20 per hour); <u>Burdick</u>, 191 B.R. at 537 ($50 flat fee); <u>In re Cordero</u>, 185 B.R. 882, 886 (Bankr. M.D. Fla. 1995) ($50 flat fee).

First, the Defendants will for other reasons be ordered to disgorge all fees to the debtors, so a determination of differences between excessive and reasonable fees is not required.  And apart from the anecdotal narrative of the services provided by the Defendants, neither the Defendants nor the Trustee provided the Court with any evidence or substantive argument regarding the value of the legitimate services provided by a bankruptcy petition preparer.  For this reason, the Court declines, at this time, to establish any hourly or flat fee limit for bankruptcy petition preparers in this District, and will continue to evaluate bankruptcy petition preparer fees on a case-by-case basis.[76]

## K.    Injunction

In addition to fines and sanctions for the Defendants' violations of § 110, the Trustee has asked the Court to enjoin the Defendants from preparing bankruptcy petitions in this District.  The Court's authority to issue such an injunction is provided under § 110(j):

> Under § 110(j), the court may enjoin BPPs from engaging in specific conduct or may completely enjoin them from acting as BPPs.  An injunction may forbid the particular conduct which violates § 110 (or another Code provision) or forbid actual fraudulent, unfair, or deceptive acts.  See 110(j)(2)(A).  The court may also issue a permanent injunction under 110(j)(2)(B), forbidding a person from acting as a bankruptcy petition preparer, if it finds that the person repeatedly violated § 110 or other Code provisions; continued to pursue his fraudulent, unfair, or deceptive conduct; failed to pay a § 110 penalty; or failed to pay a fee

---

[76] It should be noted, however, that two judges in this District have determined that $20 per hour is a reasonable fee for bankruptcy petition preparation services.  See Bonarrigo, 282 B.R. at 107; Hartman, 208 B.R. at 780.  In the absence of evidence that the rates established in those cases are out-of-date, the Court finds those holdings persuasive in evaluating petition preparer fees.  Nevertheless, a local rule requiring the filing of an application for compensation consistent with Massachusetts Local Bankruptcy Rule 2016-1 for those charges in excess of a fixed amount might prove helpful to the Court and others in the future.

disgorged by court order.  Permanent injunctive relief is appropriate when "merely enjoining the conduct would not be sufficient to prevent continued interference with the proper administration of the Bankruptcy Code."

Bowyer, 2013 WL 1141545 at *15 (quoting Bartok v. DeAngelis, 2012 WL 664928 at *6

(D.N.J. Feb. 29, 2012)) (additional citations omitted).[77]

---

[77] The text of § 110(j) provides:

(j)     (1)     A debtor for whom a bankruptcy petition preparer has prepared a document for filing, the trustee, a creditor, or the United States trustee in the district in which the bankruptcy petition preparer resides, has conducted business, or the United States trustee in any other district in which the debtor resides may bring a civil action to enjoin a bankruptcy petition preparer from engaging in any conduct in violation of this section or from further acting as a bankruptcy petition preparer.

(2)     (A)     In an action under paragraph (1), if the court finds that--

(i)     a bankruptcy petition preparer has--

(I)     engaged in conduct in violation of this section or of any provision of this title;

(II)     misrepresented the preparer's experience or education as a bankruptcy petition preparer; or

(III)     engaged in any other fraudulent, unfair, or deceptive conduct; and

(ii)     injunctive relief is appropriate to prevent the recurrence of such conduct,

the court may enjoin the bankruptcy petition preparer from engaging in such conduct.

(B)     If the court finds that a bankruptcy petition preparer has continually engaged in conduct described in subclause (I), (II), or (III) of clause (i) and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of this title, has not paid a penalty imposed under this section, or failed to disgorge all fees ordered by the court the court may enjoin the person from acting as a bankruptcy petition preparer.

(3)     The court, as part of its contempt power, may enjoin a bankruptcy petition preparer that has failed to comply with a previous order issued under this section. The injunction under this paragraph may be issued on the motion of the court, the trustee, or the United States trustee (or the bankruptcy

As one court has observed, "where permanent injunctions have been imposed . . . courts have often found egregious conduct on the part of the bankruptcy petition preparer combined with violations of earlier court orders." <u>Jay</u>, 446 B.R at 255 (collecting cases).    In cases involving the first allegations of petition preparer misconduct – either violations of § 110 or the unauthorized practice of law – some courts have enjoined the preparer from further violating § 110 or engaging in the unauthorized practice of law, but have declined to permanently enjoin the preparer from preparing petitions. <u>See, e.g.</u>, <u>Sanchez</u>, 446 B.R. at 541-42; <u>Payne</u>, 414 B.R. at 114; <u>Moore v. Jencks</u>, 232 B.R. at 13; <u>Hartman</u>, 208 B.R. at 781; <u>Patton</u>, 1999 WL 431095 at *11.

In cases where a petition preparer has continually violated § 110, has previously been admonished or enjoined from the unauthorized practice of law or further § 110 violations, or has acted in a fraudulent, unfair, and deceptive manner, courts have held that such circumstances warrant an injunction against acting as a bankruptcy petition preparer. <u>See, e.g.</u>, <u>Bowyer</u>, 2013 WL 1141545 at *15; <u>Johnson</u>, 2012 WL 5193964 at *9; <u>Bagley</u>, 433 B.R. at 334-35; <u>Carrier</u>, 363 B.R. at 258-59; <u>Steward</u>, 312 B.R. at 183; <u>Bradshaw</u>, 233 B.R. at 323, 326-27 (Bankr. D.N.J. 1999); <u>Bonarrigo</u>, 282 B.R. at 107-08; <u>Schweitzer</u>, 196 B.R. at 626.

In order to permanently enjoin the Defendants from preparing bankruptcy petitions, the Court must first find, pursuant to §§ 110(j)(2)(A) and (B), that the Defendants have continually engaged in (1) violations of § 110, (2) misrepresenting

---

administrator, if any).

. . .

11 U.S.C. § 110(j).

their experience or education as bankruptcy petition preparers; or (3) fraudulent, unfair, or deceptive conduct.   11 U.S.C. §§ 110(j)(2)(A), (B).   The Court finds that the Defendants have continually violated § 110 and engaged in fraudulent, unfair, or deceptive conduct in each of the cases presently before the Court, as well as the numerous other cases filed in this district.   By their own description of the "Pinnacle System," the Defendants violate § 110(e)(2) and act fraudulently, unfairly, or deceptively by providing legal advice and engaging in unauthorized legal practice in connection with each and every bankruptcy petition they prepare.   And, as highlighted in the previous analysis, many of the Defendants' common practices violate other sections of § 110 as well.

The Court must then determine whether "an injunction prohibiting such conduct would not be sufficient to prevent [the Defendants'] interference with the proper administration of this title."   11 U.S.C. § 110(j)(2)(B).   The Court finds, under these circumstances, that a more narrowly-tailored injunction would not be sufficient to prevent the Defendants from further violating § 110, engaging in the unauthorized practice of law, or interfering with proper administration of the Bankruptcy Code.   As outlined throughout this memorandum, Burton and Pinnacle staff did not testify credibly at trial and presented the Court with pleadings, evidence, and testimony rife with contradiction and, in some cases, outright fiction.   And, despite the "plethora of bankruptcy and state cases dealing with similar, if not identical, situations," Kaitangian, 218 B.R. at 117-18, Burton did not appear to grasp that Pinnacle's professed practices violated both § 110 and Massachusetts law prohibiting the unauthorized practice of law. When the gravity of the Defendants' violations should have become apparent, Burton

demonstrated a "total lack of remorse or reflection," Bernales, 345 B.R. at 228-29, instead becoming more obstinate and flippant in his testimony and in the pleadings submitted to the Court.

Given these circumstances, the Court finds that a more limited injunction would not sufficiently deter the Defendants from continuing to violate § 110 and engage in unauthorized legal practice. The Court will therefore enter an injunction prohibiting the Defendants from preparing bankruptcy petitions in the District of Massachusetts. Because this is an extreme remedy, however, the Court would entertain a future petition from the Defendants seeking permission to resume acting as bankruptcy petition preparers upon demonstration that the deficiencies in their practice, as outlined in this memorandum, have been rectified. See, e.g., Baugh, 416 B.R. at 910-11; Kaitangian, 218 B.R. at 117-18.

IV.    CONCLUSION

For all the foregoing reasons, the Court will enter orders GRANTING each of the Trustees' Motions to Disgorge and Amended Motions to Disgorge, and will issue judgment for the Trustee in the Adversary Proceeding.[78]  Burton and Pinnacle will be held jointly and severally liable for the disgorged fees, fines, and sanctions in each case.[79]  The Defendants will be ordered to timely (a) pay to the Trustee (i) the fines assessed under § 110(l)(1) and (ii) the amount of the disgorged fees and § 110(i)(1)

---

[78] The Court will also issue an appropriate order in furtherance of the Order to Show Cause issued in the Lacroix case.

[79] See Sanchez, 446 B.R. at 537 n.4; Johnson, 2012 WL 5193964 at *8; Bernales, 345 B.R. at 227; Kaitangian, 218 B.R. at 115. Johnson, 2012 WL 5193964 at *8.

sanctions assessed in the Rosario case[80] and (b) provide to the Trustee, in the form of treasurer's checks or other certified funds made payable to each of the debtors (except the Rosarios) the amount of the disgorged fees and § 110(i)(1) sanctions in their respective cases.   Upon receipt, the Trustee shall distribute those checks or other certified funds to each of the debtors entitled thereto.   The Court will further enjoin the Defendants from acting as bankruptcy petition preparers in the District of Massachusetts, subject to further review upon petition by the Defendants and for good cause shown.   Orders in conformity with this Memorandum shall issue forthwith.


By the Court,



_____
Dated: May 29, 2013                                    Henry J. Boroff
                                                                   United States Bankruptcy Judge


---

[80] Since the Rosarios released the Defendants from all liability as to them, it is more appropriate that the disgorged fees and sanctions attributed to the Rosario case be paid to the Trustee, consistent with the payment of fines assessed under § 110(l)(1).